**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Lisa Reed and Mary McDowell, On behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>     v.<br><br>Advocate Health Care; Children's Memorial Hospital; Evanston Northwestern Healthcare; Resurrection Health Care; University of Chicago Hospitals,<br><br>         Defendants. | Civil Action No. 07-mc-00450-RMU |
| Wendy Fleischman and Cindy Cullen, On behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>     v.<br><br>Albany Medical Center; Ellis Hospital; Northeast Health; Seton Health System; St. Peter's Health Care Service,<br><br>         Defendants. | Civil Action No. 07-mc-00451-RJL |
| Pat Cason-Merendo and Jeffrey A. Suhre, On behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>     v.<br><br>Detroit Medical Center; Henry Ford Health System; Mount Clemens General Hospital, Inc.; St. John Health; Oakwood Healthcare Inc.; Bon Secours Cottage Health Services;<br><br>William Beaumont Hospital d.b.a. Beaumont Hospitals; Trinity Health Corp.,<br><br>         Defendants. | Civil Action No. 07-mc-00452-EGS |

Suzanne C. Clarke and Conise Dillard, On behalf of
themselves and all others similarly situated,

        Plaintiffs,

    v.

Baptist Memorial Healthcare Corporation and
Methodist Healthcare,

        Defendants.

Civil Action No. 07-mc-00463-RMU

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO QUASH SUBPOENAS DIRECTED AT THE MINTZ GROUP

## <u>TABLE OF AUTHORITIES</u>

INTRODUCTION ..........................................................................................................1

   I.  THE INFORMATION AT ISSUE .......................................................... 2

   II. SUMMARY OF FACTS.......................................................................... 4

   III. ARGUMENT ......................................................................................... 6

        A.     The information at issue is work product, not mere facts........................ 6

        B.     The information at issue was created by or for both Plaintiffs'
              counsel and the putative class. ................................................................. 7

        C.     The information at issue was created in anticipation of these
              litigations................................................................................................. 9

        D.     Even if the information at issue was not covered by Rule 26(b)(3),
              it is protected by the federal common-law work product doctrine
              announced in *Hickman*........................................................................... 10

        E.     Protection of the information at issue is necessary for meaningful
              private class-action enforcement of antitrust law. .................................. 13

CONCLUSION ...........................................................................................................15

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Abdell v. City of New York,*
 2006 U.S. Dist. LEXIS 66114 (S.D.N.Y. Sept. 14, 2006)...........................................11, 12, 13

*Alexander v. FBI,*
 192 F.R.D. 12 (D.D.C. 2000)..................................................................................................11

*Doubleday v. Ruh,*
 149 F.R.D. 601 (E.D. Cal. 1993) ...........................................................................................13

*FEC v. Christian Coalition,*
 178 F.R.D. 61 (E.D. Va. 1998) ...............................................................................................10

*FEC v. Christian Coalition,*
 179 F.R.D. 22 (D.D.C. 1998)..................................................................................................13

*Hager v. Bluefield Regional Medical Center, Inc.,*
 170 F.R.D. 70 (D.D.C. 1997)....................................................................................................7

*Hickman v. Taylor,*
 329 U.S. 495 (1947)......................................................................................................... passim

*Hollar v. IRS,*
 No. 95-1882, 1997 WL 732542 (D.D.C. Aug. 7, 1997) ...........................................................9

*In re Sealed Case*
 676 F.2d 783 (D.C. Cir. 1982) ..............................................................................................7, 8

*Jordan v. United States Dep't of Justice,*
 591 F.2d 753 (D.C. Cir. 1978) ...............................................................................................12

*Ostrowski v. Holem,*
 No. 02-C-50281, 2003 U.S. Dist LEXIS 794 (N.D. Ill. Jan. 21, 2003)...................................13

*Ramsey v. NYP Holdings, Inc.,*
 No. 3478, 2002 WL 1402055 (S.D.N.Y. June 27, 2002)............................................................7

*Schiller v. NLRB*
 964 F.2d 1205 (D.C. Cir. 1987) ...............................................................................................9

*U.S. ex rel. Purcell v. MWI Corp.,*
 238 F.R.D. 321 (D.D.C. 2006)................................................................................................10

*U.S. v. Nobles,*
    422 U.S. 225 (1975)..............................................................................................................3

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(c)(3)............................................................................................................3

*Fed. R. Civ. P. 26(b)(3)............................................................................................... passim

Fed. R. Civ. P. 30(b)(6)............................................................................................................3

## INTRODUCTION

"[T]he general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order." *Hickman v. Taylor*, 329 U.S. 495, 512 (1947). In *Reed*, one of the cases underlying this action, Defendants sought to invade this privacy through a motion to compel the production of work product documents. *See* Exhibit ("Ex.") 1, Excerpt from Transcript of Proceedings before the Honorable John F. Grady held on November 14, 2007 in the matter of *Reed, et al. v. Advocate Health Care, et al.*, No. 06-C-3337 (N.D. Ill.). The *Reed* Court rejected this effort, denying Defendants' claim, reiterated in their opposition brief, that the investigative work performed by the James Mintz Group, Inc. ("Mintz"), in preparation for these litigations, was done on behalf of the SEIU, a non-party, for non-litigation purposes, and thus not subject to work product protection.[1]

The information contained in those Mintz documents at issue in *Reed* is the same information at the heart of this Motion. Defendants essentially seek to circumvent the *Reed* court's ruling by deposing Plaintiffs' paralegal investigative team and thereby obtaining via deposition the information contained in the work product documents to which they are not entitled. Remarkably, Defendants make this effort without even attempting to demonstrate any

---

[1]     Defendants argue that Judge Grady's decision is inapplicable because he "only decided that the *documents* created by Mintz were privileged work product. That ruling did not address the question whether 'intangible items,' such as deposition testimony, constitutes work product." Defs.' Resp. at 6 n.9.  This distinction is spurious.  Judge Grady determined that Defendants were not entitled to the information contained in the Mintz Group's files because the information is protected work product.  Defendants should not be permitted to evade Judge Grady's decision through simple expedient of obtaining testimony about the same information.  Nor is Defendants' effort at distinguishing Judge Grady's ruling consonant with *Hickman*, which explicitly forbade not only the production of the investigating attorney's witness interview notes, but also a deposition of that attorney.  329 U.S. at 512-513.

particular need for the information at issue. This request should be denied.

## I. THE INFORMATION AT ISSUE

As an initial matter, it is crucial to understand exactly what deposition testimony Defendants seek. The Mintz Group, a private investigative firm that has worked with Plaintiffs' counsel Cohen, Milstein, Hausfeld & Toll ("Cohen Milstein") many times in the past, conducted, under the direction and control of Cohen Milstein and its co-counsel James & Hoffman ("J&H"), an investigation into Defendants' conspiracies to suppress RN compensation in several cities. Mintz's investigation was entirely focused on evaluating the prospects of, and then successfully bringing, Sherman Act suits against Defendants. Cohen Milstein and J&H supervised all aspects of this investigation, for example by telling Mintz who to interview and what facts and combination of facts to pursue by developing the "scripts" Mintz used to interview and re-interview witnesses, and directly by conducting some interviews in conjunction with Mintz. Defendants, who have already been denied access to this information in documentary form by federal district courts in Chicago and San Antonio, claim the right to circumvent those decisions by deposing the Mintz Group to acquire the same information.

Defendants misleadingly imply that they seek primarily only information about the Mintz Group's relationship with Plaintiffs' counsel and other organizations rather than work product created in anticipation of these litigations. *See, e.g.*, Defs.' Resp. at 6-7. Defendants' subpoena specifications, however, plainly seek information uncovered over the course of the Mintz Group's investigation of Defendants' antitrust conspiracies. *See* Mintz Deposition Subpoenas, Attached to Plfs.' Br. as Ex. F to Dean Decl., Topics 7-9, 11-12 and 14. At times, Defendants candidly admit this in their Response. *See, e.g.*, Defs.' Resp. at 8. This information was gathered or acquired by Mintz – an agent of Plaintiffs' counsel acting under counsels' direction

2

and control, using methods devised in collaboration with and approved by Plaintiffs' counsel –

or gathered or acquired by Plaintiffs' counsel and given to Mintz to assist in the investigation.

All of the information related to the Mintz investigation is work product. Indeed, because

it is predominantly the result of witness interviews, it is the very archetype of opinion work

product. *See Hickman*, 329 U.S. at 512 ("As to oral statements made by witnesses to [an

attorney], whether presently in the form of…mental impressions or memoranda, we do not

believe that any showing of necessity can be made…"). It is irrelevant, for purposes of the work

product analysis, whether this information was generated by Plaintiffs' counsel or an agent of

Plaintiffs' counsel. *See U.S. v. Nobles*, 422 U.S. 225, 238-39 (1975) (extending *Hickman* to

information "prepared by agents for the attorney"); *See also* Ex. 1 at p. 5 ("[N]ow the

parenthetical inclusion [in Rule 26(b)(3)] makes it clear that it doesn't have to be an attorney

who does the investigation. An investigation done by an agent is sufficient" for purposes of the

work product doctrine). This information is entitled to the highest level of protection and is thus

not subject to disclosure, at least absent the very highest showing of need – a showing

Defendants' have not even attempted to make.[2]

---

[2]    The remaining specifications seek information that appears to be of little or no relevance
to the underlying cases, such as the organizational structure of Mintz; the relationships between
Mintz and Plaintiffs' counsel; plans by SEIU to organize Defendants' workers; and any
communications among SEIU, the Institute for Women's Policy Research ("IWPR"), the
Feldman Group, Barbara Bergmann, Plaintiffs and/or Plaintiffs' counsel. *See* Plfs.' Br. at 8-9
(quoting Mintz subpoenas). Although of limited relevance, this information has already been
provided to Defendants in the Declarations of Christopher Weil, Mathew Clash-Drexler, David
Dean and Mary Joyce Carlson, as well as during their various Rule 30(b)(6) depositions of SEIU,
Barbara Bergmann and IWPR, and the many thousands of pages of documents those third parties
produced in response to Defendants' subpoenas. Defs.' Resp. at 1-7. Thus, while some narrow
category of the information sought may not be work product, given Mintz's status as an agent of
counsel for the Plaintiffs, this information should be obtained through less intrusive means, such
as a request for production of documents, interrogatories or depositions on written questions.
*See* Fed. R. Civ. P. 26(c)(3). Defendants' demand to depose Mintz over non-work product
subjects Defendants already know everything about is a transparent attempt to obtain information
which has already been found to constitute opinion work product.

## II. <u>SUMMARY OF FACTS</u>

Defendants' Reply is riddled with factual errors, but is based on one central misstatement of fact – that the Mintz Group's investigation into Defendants' antitrust conspiracies "was done for the Service Employees International Union." Defs.' Resp. at 1; *see also id.* at 8 ("Defendants seek to depose the Mintz Group about its involvement in the RN wage litigations, including the facts and information it learned during its investigation *for the SEIU*."). The true history of the events leading to the filing of these lawsuits was provided in Plaintiffs' opening brief, in the Declarations of David Dean, Michael Hausfeld, Chris Weil, and Mary Joyce Carlson attached thereto, and in the Declarations of David Dean and Matthew Clash-Drexler which previously were provided to Defendants in the *Reed* case, and are attached hereto as Exhibits 2 and 3, respectively. However, one need not delve deeply into that history to understand that Defendants' characterization is wholly inaccurate, as plainly evidenced by three key indisputable facts.

First, SEIU never even saw the materials produced by the Mintz Group over the course of its investigations into Defendants' collusion until well after these lawsuits had been filed, as part of the discovery process in the *Reed* case. *See* Carlson Decl. ¶16, Attached to Plfs.' Br. as Ex. A to Dean Decl. Even now, no SEIU personnel other than its outside counsel hired to represent it in responding to Defendants' discovery requests, Bredhoff & Kaiser ("B&K"), has viewed these materials. *See* Ex. 2¶ 10; Ex. 3 ¶¶3-6. Plaintiffs' Counsel provided these materials to SEIU's counsel only because District of Columbia attorney ethics rules arguably required it, and only after securing B&K's agreement to treat the materials as Plaintiffs' work product. *See* Carlson Decl. ¶16. Nor has Mintz communicated its findings to SEIU. *See* Weil Decl. ¶6, Attached to Plfs.' Br. as Ex. C to Dean Decl. These facts are wholly inconsistent with Defendants' notion

that the Mintz Group's investigation was conducted for an SEIU organizing purpose. They are perfectly consistent with the truth, namely that the Mintz investigation was intended to be, and in fact was, utilized exclusively for the nurse wage litigations. *See* Carlson Decl. ¶16; Dean Decl. ¶10.[3]

Second, while SEIU acted as a partial third-party payor for the Mintz Group's pre-filing investigation, just as it acts as a partial third-party payor for the ongoing lawsuits, it was not a full third-party payor. From December 2005 onward, Cohen Milstein and J&H split the costs of the Mintz investigation between them. *See* Ex. 2 ¶10. While SEIU reimbursed J&H for its share of those costs, it did not reimburse Cohen Milstein for its share. *Id.* In addition to partially paying for the investigation, Cohen Milstein joined J&H in supervising the Mintz Group's investigators. *See* Plfs.' Br. at 6-7; Carlson Decl. ¶15; Weil Decl. ¶3. Cohen Milstein has no particular relationship with SEIU, and Defendants offer no explanation for why CHMT would sink substantial sums of money into an investigation of hospital collusion if that investigation was not aimed at filing these or similar lawsuits. Indeed, Defendants' only recourse is to bury their heads in the sand. *See, e.g.*, Defs.' Resp. at 11, 20 ("It was the SEIU who retained and paid for the Mintz Group, not Plaintiffs or Plaintiffs' counsel."). Defendants provide no support for this assertion, and it is wrong.

Third, as Plaintiffs made clear to Defendants during the course of briefing the Defendants' unsuccessful motion to compel the production of the Mintz Group's documents, all

---

[3]    Defendants imply that their "limited discovery to date" has uncovered some new, suggestive fact about the relationship of SEIU to these litigations. *See, e.g.,* Defs' Resp. at 7. In reality, Defendants have completed full document discovery and days of depositions of SEIU, Barbara Bergmann, various SEIU locals and other related personnel and entities without discovering a single fact about the relationship that Plaintiffs did not set out in full at the commencement of the litigations, and again in the Declarations submitted in the context of the motion practice over document production. *See, e.g.,* Carlson Decl., Attached to Plfs.' Br. as Ex. A to Dean Decl.

of the Mintz Group's work occurred *after* January 10, 2005, the date J&H was retained by a registered nurse in another metropolitan area who wished to pursue a class action claim that hospitals in that city had conspired to suppress RN wages. *See* Ex. 2 ¶3 and Attachment 1 thereto.[4] While a complaint has not yet been filed in that jurisdiction, the methods, strategies, and legal analysis that would be revealed by a deposition of the Mintz Group in these cases are the same as those employed in preparing and evaluating that potential claim. Therefore, Defendants' argument that information uncovered by private investigators working on behalf of counsel in anticipation of litigation before counsel is retained by a client can never constitute work product is not only legally defective, *see* 6-13 *infra*, but factually irrelevant.

### III. ARGUMENT

**A.    The information at issue is work product, not mere facts.**

Defendants repeatedly claim that the purpose of the Mintz deposition is to obtain factual information regarding Mintz's involvement in the nurse compensation lawsuits, not the mental impressions of Plaintiffs' counsel or their agents. *See, e.g.*, Defs.' Resp. at 6-8, 14, 18; *cf.* Albany Transcript, Attached to Plfs.' Br. as Ex. G to Dean Decl., ("Let me be clear that we're not interested in the legal or mental impressions of [Cohen Milstein], frankly, even [J&H]"). In support of their claim that they seek facts rather than work product, Defendants incredibly cite *Hickman* – even though *Hickman* holds that exactly this type of information represents canonical work product. *See* 392 U.S. at 512. Defendants' Motion is not simply an attempt to obtain facts,

---

[4]    Mr. Dean's declaration in *Reed*, which was filed with that Court with certain portions under seal, identifies the particular area where J&H's client worked and where J&H considered and is still considering filing an antitrust suit. That information has been redacted from Exhibit 2 because Plaintiffs believe this particular information itself constitutes attorney work product and, in any event, is unnecessary to establish that information related to the Mintz investigation is work product. Should the Court feel otherwise, Plaintiffs would be happy to submit Mr. Dean's *Reed* declaration and attachment 1 thereto (J&H's retainer agreement with that client) as it was filed in *Reed*, under seal.

or even fact work product, but opinion work product revealing the legal and strategic thinking of Plaintiffs' counsel and their agents in evaluating and preparing to file these very cases. The rule in this Circuit, as articulated by this Court, is that there is a more "absolute protection for 'opinion' work product which is subject to discovery only upon a showing of *extraordinary justification*." *Hager v. Bluefield Regional Medical Center, Inc.*, 170 F.R.D. 70, 76 (D.D.C. 1997) (J. Urbina) (citing *In re Sealed Case*, 676 F.2d 793, 810 (D.C. Cir. 1982) (emphasis added)). Defendants cannot satisfy this burden and are thus not entitled to the information they seek.

**B.**   **The information at issue was created by or for both Plaintiffs' counsel and the putative class.**

Defendants' argument that the withheld information does not fall under the literal language of Rule 26(b)(3) is simply wrong. Rule 26(b)(3) protects information created "in anticipation of litigation by or for another party *or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)*[.]" Fed. R. Civ. P. 26(b)(3). J&H and Cohen Milstein are attorneys for "another party" (the named Plaintiffs), and all of the withheld information was created "by or for" J&H and/or Cohen Milstein in anticipation of these very cases.[5]

---

[5]   Defendants cite to *Ramsey v. NYP Holdings, Inc.*, No. 00CV3478, 2002 WL 1402055 (S.D.N.Y. June 27, 2002), for the proposition that if a parent cannot be an agent to a minor child for work product purposes, Mintz cannot be an agent to Plaintiffs or Plaintiffs' counsel. *Ramsey* does not stand for this position. The Court's refusal to extend work product protection to the documents at issue in *Ramsey* was not based on whether the parents were agents of their minor child. Rather, work product protection could not attach because the documents were not created in anticipation of litigation involving the child, but rather to "defend[] Mr. or Mrs. Ramsey in the event that either of them was charged with criminal conduct in connection with the death of their daughter." *Id.* at *5. Here, the information was clearly created in anticipation of these class action litigations. As such, *Ramsey* is inapposite.

Moreover, Defendants' contention that when "the Mintz Group commenced its investigation, there was no 'articulable claim'" and no "Plaintiffs" and thus no "work product protection" is both factually and legally inaccurate. Defs.' Resp. at 17. This position is simply not reconcilable with the well-established proposition that the work product doctrine protects "a complex of individual interests particular to attorneys that their clients may not share" including "the interests of attorneys in their own intellectual product." Plfs.' Br. at 17 (quoting *In re Sealed Case*, 676 F.2d 793, n.56).

In addition, Plaintiffs' factual submission establishes that the information at issue was created in anticipation of this very action on behalf of the putative class. In fact, the *Reed* Court found that the purpose of the Mintz investigation was "to determine whether litigation had a reasonable prospect of success. In that sense, it was an investigation conducted in contemplation of litigation" on behalf of the putative class. *See* Ex. 1 at p. 9. That putative class existed at all relevant times, and simply to ensure their own adequacy as class representatives, Plaintiffs' counsel could not, during the pre-filing investigation or afterward, align themselves with interests contrary to that class. Plaintiffs' counsel was acting for the putative class members' benefit in conducting its pre-filing investigation, and it is entirely correct to say the withheld information was created "for" the putative class.[6]

---

[6]     Defendants' extended discussion of a draft retainer sent to J&H in October 2005 (which contained multiple terms on which the parties had not agreed and which were changed in the actual retainer, formalized in February 2006 to accurately reflect their agreement) is simply not relevant. Defs.' Resp. at 10-12. Even if Mintz's investigation, the fruits of which were never even seen, much less used by the SEIU prior to the institution of the underlying lawsuits (and even then only by counsel), was undertaken "for" the SEIU, it was nevertheless undertaken "for" the SEIU in its capacity as a third-party payor to this case. It is true that James & Hoffman provided legal advice to the SEIU regarding whether or not these litigations were likely to succeed to assist the SEIU's decision about whether or not to partially fund the cases, and that Mintz's investigation was essential to this advice. *See* Ex. 2 ¶ 9. This does absolutely nothing to change the fact that the investigation was carried out in anticipation of these very litigations and

**C.    The information at issue was created in anticipation of these litigations.**

Defendants' discussion of the "anticipation of litigation" aspect of the work-product doctrine is based on misstatements of both fact and governing law.  First, Defendants contend that Plaintiffs must demonstrate that the information at issue was created "with a specific claim supported by concrete facts which would likely lead to litigation in mind."  *See* Defs.' Resp. at 15 (citations omitted).  However, Plaintiffs' burden in this Circuit, as articulated by this Court and others within this Circuit, is to demonstrate that the information was created when litigation was "foreseeable . . . even if no specific claim is contemplated."  *See Hollar v. IRS*, No. 95-1882, 1997 WL 732542, at *6 (D.D.C. Aug. 7, 1997) (J. Urbina) (citing *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C Cir. 1987)).  Even under Defendants' mistaken view of the law and facts, Plaintiffs would prevail because the information at issue was created with these specific antitrust claims in mind.

Second, Defendants repeatedly argue that the primary purpose of the SEIU's investigation was to "brand" SEIU nationally as a nurse organization.  Defs.' Resp. at 2; *accord id.* at 7, 12 and 16.  This is a red herring.  Plaintiffs do not claim that information generated in the course of the SEIU's own investigations, or any other part of its public campaign, is work product.  Thus, Plaintiffs have not objected to Defendants' depositions of the SEIU or SEIU's employees who conducted investigations in certain cities where the underlying suits were filed.  Plaintiffs claim work product protection only over information generated by Mintz in collaboration with Plaintiffs' counsel in anticipation of filing these lawsuits.  Any suggestion that Mintz's investigation was undertaken primarily in support of SEIU's organizing efforts is entirely undermined by the fact that Cohen Milstein, which has no particular relationship with

---

thus for the benefit of the putative plaintiff classes, as accurately reflected in the actual retainer agreement from February 2006.

SEIU, paid a substantial portion of the Mintz Group's fees.  *See* Ex. 2 ¶8.[7]  Nor can it be

reconciled with the fact that SEIU personnel never even saw, much less used, the documents or

information generated during the Mintz investigation.  *See* Ex. 3 ¶6; Ex. 2 ¶16.[8]  That

Defendants' recitation of the facts supporting its "anticipation of litigation" argument entirely

focuses on the SEIU, which is not the subject of the instant subpoenas, rather than Mintz or the

investigation it conducted on behalf of Plaintiffs and Plaintiffs' counsel, strongly suggests that

their preferred tactic is to attempt to blur the facts and thereby mislead this Court.  *See* Defs.'

Resp. at 9-13.

**D.      Even if the information at issue was not covered by Rule 26(b)(3), it is protected by the federal common-law work product doctrine announced in *Hickman*.**

As demonstrated in Plaintiffs' opening brief, the policies articulated in *Hickman* strongly

support their work product claim, and courts have expressed a willingness to apply the federal

common-law work product doctrine announced in *Hickman* directly where Rule 26(b)(3)'s literal

text proves insufficient to protect those policies.  *See* Plfs.' Br. at 18-19.  Defendants dispute the

---

[7]      In fact, during her 30(b)(6) deposition, Jamie Cohen, representative for the SEIU, explicitly stated that she was not competent to testify about the Mintz investigation because it was "directed and controlled by James & Hoffman."  Deposition of Jamie Cohen at p. 24, Attached as Ex. 10 to Defs.' Resp.

[8]      The fact that IWPR and/or Professor Bergmann may have seen or commented on counsel-generated or Mintz-generated work product information does not waive the doctrine's protections.  *See, e.g., U.S. ex rel. Purcell v. MWI Corp.*, 238 F.R.D. 321, 326 (D.D.C. 2006) (J. Urbina) (citing *In Re Sealed Case*, 676 F.2d at 808) (because the work product privilege "looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality, [it] is not automatically waived by any disclosure to a third party"); *FEC v. Christian Coalition*, 178 F.R.D. 61, 76 (E.D. Va. 1998) ("Work product protection . . . exists to encourage an attorney to prepare effectively for litigation.  It would be consistent with the purpose of the work product doctrine to *encourage* sharing of the material with anyone who could help the attorney prepare for trial.  *It would completely stand the work product doctrine on its head to allow discovery of an attorney's work product simply because that attorney shared it with someone who was helping him prepare for litigation*[.]") (second emphasis added).

second point, quite explicitly claiming the right to rifle through the mind of opposing counsel for legal and factual research created in anticipation of these very cases based solely on their formalistic interpretation of Rule 26(b)(3). *See* Defs.' Resp. at 17-20. Even if this information was created "on behalf" of SEIU and even if Defendants' reading of Rule 26(b)(3) was not only plausible but the only plausible reading of the rule, the information at issue is protected by the common-law rule enunciated in *Hickman*.

Defendants devote much of their brief to attempts to factually distinguish well-established case law that holds that the federal common-law work product doctrine protects materials outside the literal confines of Rule 26(b)(3) from disclosure where necessary to further the interests articulated in *Hickman*. *See* Defs.' Resp. at 17-20. To take but one example, Defendants cite to *Alexander v. FBI*, 192 F.R.D. 12 (D.D.C. 2000), for the proposition that the work product doctrine does not extend to depositions of investigators. That case is plainly distinguishable because the investigator in *Alexander* was not an agent of Plaintiffs' counsel hired in anticipation of litigation. Rather, the investigator was hired by an *intervenor's* attorney to investigate a matter entirely unrelated to the case before the court. Here, Plaintiffs' counsel retained an investigative firm to determine whether or not to bring an antitrust lawsuit based on collusion amongst hospital employers. Neither the reasoning nor the ruling in *Alexander* addresses such a circumstance.

Moreover, Defendants' studied avoidance of the rationale of the cases Plaintiffs cite in their opening brief simply underscores the weakness of Defendants' position. For example, in *Abdell v. City of New York*, 2006 U.S. Dist. LEXIS 66114 (S.D.N.Y. Sept. 14, 2006), although the Court ultimately decided that the information in question – a routine form filled out by a

criminal prosecutor – was not protected by the work product doctrine in a later civil case, this

conclusion was reached only *after* applying the following analytic framework:

- First, the court found that the materials, created by a prosecutor who was (unlike Plaintiffs' counsel in the instant case) neither a party nor the representative of a party to the civil case were not protected by Rule 26(b)(3). *Id.* at \*12. "The inquiry does not end there, however, because the work-product doctrine as articulated in [*Hickman*] is broader than Rule 26(b)(3)." *Id.*

- Second, the court listed the primary interests advanced by *Hickman*, finding that "The doctrine serves at least three purposes. First, it ensures that an attorney will not alter his behavior for fear that his adversary will learn his strategies and thereby gain an advantage . . . Second, protecting work product alleviates the "freeloader" problem. An attorney who has access to the results of his adversary's research and investigation has less incentive to be diligent in his own trial preparation . . . Finally, the work product doctrine serves to prevent disruption of ongoing litigation." *Id.* at \*14-15.[9]

- Then, only *after* concluding that disclosure would not alter attorney behavior (because New York prosecutors were required to turn such materials over to criminal defendants anyway), *id.* at \*15-18, reward sloth (because the prosecutor was not an opponent of the civil party's counsel), *id.* at \*18-19, or disrupt ongoing litigation (because the criminal trial had ended), *id.* at \*19-20, did the court deny the prosecutor's motion to quash the subpoena.

Were Defendants' view an accurate statement of the law, this process would end after the first

sentence of step one, above, a position incompatible with *Abdell* and similar authorities.  Here,

disclosure would seriously alter attorney behavior in complex antitrust class actions (*see*

Declaration of Michael Hausfeld, attached to Plfs.' Br. at ¶¶14-15), discourage thorough

preparation by allowing Defendants' counsel to appropriate their opponents' work, and thereby

---

[9]     The policies underlying the doctrine were articulated similarly in *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 775 (D.C. Cir. 1978) ("[T]he purpose of the [work product] privilege is to encourage effective legal representation within the framework of the adversary system by removing counsel's fears that his thoughts and information will be invaded by his adversary.").

also disrupt ongoing (and anticipated) nurse compensation litigations in this and other cities.[10] Disclosure is therefore barred by *Hickman*.

The reasoning of *Abdell* and similar cases has been endorsed by this Court in earlier decisions, *see FEC v. Christian Coalition*, 179 F.R.D. 22, 24 (D.D.C. 1998) ("The more considered view appears to be . . . that under the rationale of *Hickman*, non-parties should be able to assert work product privilege claims even though Rule 26(b)(3) is phrased only in terms of the parties."), and should be followed in this case.

**E.    Protection of the information at issue is necessary for meaningful private class-action enforcement of antitrust law.**

As demonstrated in Plaintiffs' opening brief, investigations like the one conducted by Mintz are essential for meaningful private class action enforcement of antitrust laws.    In recognition of this principle, the *Reed* Court noted that the "paradigm of the single practitioner who does a modest amount of investigation before filing an action on behalf of a single client still exists, but it has little relationship to the kind of litigation we're involved with in" these class action lawsuits. Ex. 1 at p. 3.    In order to bring a successful class action law suit, which arises under "complicated statutory provisions," a substantial amount of time and money is necessary. *Id.* For instance, experts need to be retained to ensure that the legal theory is viable and witness interviews, which are "wide-ranging geographically and time-consuming in number and

---

[10]    *Accord, Ostrowski v. Holem*, No. 02-C-50281, 2003 U.S. Dist LEXIS 794, *12-13 n.2 (N.D. Ill. Jan. 21, 2003) (declining to apply the work product doctrine, in a later civil case, to materials generated by a government prosecutor in a criminal case, but noting that "if two civil litigations are involved the result would be different due to the potential unfairness for an attorney in one case to hand over his/her diligent work product to an attorney who may not have worked very hard in discovery"); *Doubleday v. Ruh*, 149 F.R.D. 601, 607 n.6 (E.D. Cal. 1993) ("The . . . holding in this case is limited to the situation presented here – the prior case is criminal, and the subsequent case is civil . . . where two civil litigations are involved, there is the potential for unfairness in that the attorney subpoenaed in the later litigation may have to disgorge a library of facts acquired through the expenditure of a great deal of resources over time.").

duration" must take place. Because few lawyers or clients have the funds to pay for such investigations there becomes "almost a necessary connection between investigation[s] that [are] done by a body which is not going to be a party to any litigation that ensues from the investigation and the party who actually brings the investigation." *Id.* Despite Defendants' arguments to the contrary, it matters little whether the SEIU intended to be a party or a non-party to the litigation which eventually ensued. Indeed, it cannot be the case that a claim of work product protection for a pre-filing investigation rises and falls on the basis of whether a third-party payor intended to become a party to the potential case. Nor is it reasonable to suggest that a case must be filed and a plaintiff retained before work product protection attaches. Such a conclusion would result in an influx of lawsuits being filed "so that the necessary investigation which should precede the filing would be protected as work product." *Id.* at p. 6. This result would neither be desirable nor comport with well-established notions of practicality, efficiency or common sense.

Moreover, it cannot be the case that a large firm with the funds to maintain an in-house investigative team would be shielded from disclosing information under the work product doctrine, while a small firm, which hires an external investigator, is not. This would be tantamount to rewarding size and wealth rather than protecting the mental impressions of Plaintiffs' counsel and their agents for which the work product doctrine was created. Where, as here, an investigation has been directed and controlled by Plaintiffs' counsel in anticipation of litigation on behalf of the putative class, work product protection should attach to the information generated during that investigation. This Court should not adopt an interpretation of the work product doctrine that leads to any other result.

## CONCLUSION

For the reasons set forth herein, Plaintiffs' Motion to Quash should be granted.

Dated: November 30, 2007

Respectfully submitted,

By:  /s/ Charles E. Tompkins

Michael D. Hausfeld, Bar No. 15374
Daniel A. Small
Charles E. Tompkins, Bar No. 459854
Shelly L. Friedland
Kalpana Kotagal
Sharon K. Robertson
COHEN, MILSTEIN, HAUSFELD &
TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600
Fax:(202) 408-4699

Thomas P. Dove
Kimberly A. Kralowec
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 433-2070
Fax: (415) 982-2076

Mark A. Griffin
Raymond J. Farrow
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1900
Fax: (206) 623-3384

Daniel E. Gustafson
Brian Williams
GUSTAFSON GLUEK PLLC
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

David P. Dean
Mary Joyce Carlson
JAMES & HOFFMAN
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036-4748
Tel: (202) 496-0500
Fax: (202) 496-0555

Arnold Levin
Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

**Attorneys for Plaintiffs**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Lisa Reed and Mary McDowell, On behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>Advocate Health Care; Children's Memorial Hospital; Evanston Northwestern Healthcare; Resurrection Health Care; University of Chicago Hospitals,<br><br>    Defendants. | Civil Action No. 07-mc-00450-RMU |
| Wendy Fleischman and Cindy Cullen, On behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>Albany Medical Center; Ellis Hospital; Northeast Health; Seton Health System; St. Peter's Health Care Service,<br><br>    Defendants. | Civil Action No. 07-mc-00451-RJL |
| Pat Cason-Merendo and Jeffrey A. Suhre, On behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>Detroit Medical Center; Henry Ford Health System; Mount Clemens General Hospital, Inc.; St. John Health; Oakwood Healthcare Inc.; Bon Secours Cottage Health Services;<br><br>William Beaumont Hospital d.b.a. Beaumont Hospitals; Trinity Health Corp.,<br><br>    Defendants. | Civil Action No. 07-mc-00452-EGS |

Suzanne C. Clarke and Conise Dillard, On behalf of
themselves and all others similarly situated,

                Plaintiffs,

      v.

Baptist Memorial Healthcare Corporation and
Methodist Healthcare,

                Defendants.

Civil Action No. 07-mc-00463-RMU

## CERTIFICATE OF SERVICE

This is to certify that on this 30th day of November 2007, I served the foregoing

upon the following via electronic mail or U.S. mail:

| | |
|---|---|
| Brian M. Culnan<br>Robert H. Iseman<br>John F. Queenan<br>ISEMAN, CUNNINGHAM LAW FIRM<br>9 Thurlow Terrace<br>Albany, NY 12203<br>518-462-3000<br>518-462-4199 (fax)<br>BCulnan@icrh.com<br>riseman@icrh.com<br>jqueenan@icrh.com | Nicholas J. D'Ambrosio, Jr.<br>BOND, SCHOENECK LAW FIRM<br>111 Washington Avenue<br>Albany, NY 12210-2280<br>518-533-3000<br>518-533-3299 (fax)<br>dambron@bsk.com |
| Louis P. Gabel<br>Michael R. Shumaker<br>Robert C. Jones<br>Stephen J. Squeri<br>Phillip A. Proger<br>JONES, DAY LAW FIRM - DC OFFICE<br>51 Louisiana Avenue, N.W.<br>Washington, DC 20005-2088<br>202-879-3939<br>202-626-1700 (fax)<br>lpgabel@jonesday.com<br>mrshumaker@jonesday.com<br>rcjones@jonesday.com<br>sjsqueri@jonesday.com<br>paproger@jonesday.com | Daniel J. Hurteau<br>NIXON, PEABODY LAW FIRM<br>Omni Plaza, Suite 900<br>30 South Pearl Street<br>Albany, NY 12207<br>518-427-2650<br>518-427-2666 (fax)<br>DHurteau@nixonpeabody.com |

| | |
|---|---|
| Michael D. Kendall<br>David Marx<br>MCDERMOTT, WILL LAW FIRM<br>28 State Street<br>Boston, MA 02109-1775<br>617-535-4000<br>617-535-3800 (fax)<br>mkendall@mwe.com<br>dmarx@mwe.com | Gordon L. Lang<br>NIXON, PEABODY LAW FIRM - DC<br>OFFICE<br>401 9th Street, N.W.<br>Suite 900<br>Washington, DC 20004<br>202-585-8319<br>202-585-8080 (fax)<br>glang@nixonpeabody.com |
| David P. Jaqua<br>Amy Pepke<br>BUTLER SNOW O'MARA STEVENS &<br>CANADA, PLLC<br>6075 Poplar Ave.<br>Ste. 500<br>P.O. Box 171443<br>Memphis, TN 38187-1443<br>901-680-7343<br>901-680-7201 (fax)<br>david.jaqua@butlersnow.com<br>Amy.pepke@butlersnow.com | Mark Thomas<br>WILSON, ELSER LAW FIRM<br>677 Broadway - 9th Floor<br>Albany, NY 12207-2996<br>518-449-8893<br>518-449-4292 (fax)<br>Mark.Thomas@wilsonelser.com |
| April J. Tabor<br>MCDERMOTT, WILL LAW FIRM<br>340 Madison Avenue<br>New York, NY 10017<br>212-547-5691<br>212-547-5444 (fax)<br>atabor@mwe.com | Richard L. Weisz<br>HODGSON, RUSS LAW FIRM<br>677 Broadway<br>Suite 301<br>Albany, NY 12207<br>518-465-2333<br>518-465-1567 (fax)<br>rweisz@hodgsonruss.com |
| Robert E. Bloch<br>MAYER, BROWN, ROWE & MAW LLP<br>1909 K Street, NW<br>Washington, DC 20006<br>(202) 263-3203<br>courtnotification@mayerbrown.com | James J. Calder<br>KATTEN MUCHIN ROSENMAN LLP<br>575 Madison Avenue<br>New York, NY 10022-2585<br>(212) 940-6460 |

| | |
|---|---|
| Amy J. Carletti<br>David L. Hanselman, Jr.<br>Stephanie Lynne Poulos<br>Jennifer A Smulin<br>Stephen Yusheng Wu<br>Benjamin J. Hanauer<br>MCDERMOTT, WILL & EMERY LLP<br>227 West Monroe Street  #4400<br>Chicago, IL 60606-5096<br>(312) 372-2000<br>acarletti@mwe.com<br>spoulos@mwe.com<br>jsmulin@mwe.com<br>swu@mwe.com<br>bhanauer@mwe.com<br>dhanselman@mwe.com | Richard Lewis Reinish<br>Peter Brian See<br>Scott Andrew Schaefers<br>Annette Tyman<br>Kirsten Kelly Wendela<br>Scott A. Carlson<br>Timothy F. Haley<br>Molly M. Joyce<br>SEYFARTH SHAW LLP<br>131 South Dearborn Street<br>Suite 2400<br>Chicago, IL 60603-5577<br>(312) 460-5000<br>(312) 460-7000 (fax)<br>scarlson@seyfarth.com<br>thaley@seyfarth.com<br>mjoyce@seyfarth.com<br>rreinish@seyfarth.com<br>bsee@seyfarth.com<br>sschaefers@seyfarth.com<br>atyman@seyfarth.com<br>kwendela@seyfarth.com |
| Anthony Thomas Eliseuson<br>Lisa Zachary Fain<br>Robert Thomas Joseph<br>Christopher Qualley King<br>Richard L. Marcus<br>Natalie J. Spears<br>Margo L. Weinstein<br>SONNENSCHEIN, NATH &<br>ROSENTHAL, LLP<br>233 South Wacker Drive<br>7800 Sears Tower<br>Chicago, IL 60606<br>(312)876-8000<br>aeliseuson@sonnenschein.com<br>lfain@sonnenschein.com<br>rjoseph@sonnenschein.com<br>cking@sonnenschein.com<br>rmarcus@sonnenschein.com<br>nspears@sonnenschein.com<br>mweinstein@sonnenschein.com | David H. Kistenbroker<br>Laura Keidan Martin<br>David S. Slovick<br>Martin T. Tully<br>KATTEN MUCHIN ROSENMAN LLP<br>525 West Monroe Street<br>Suite 1600<br>Chicago, IL 60661<br>(312) 902-5200<br>david.kistenbroker@kattenlaw.com<br>Laura.martin@kattenlaw.com<br>David.Slovick@kattenlaw.com<br>Martin.tully@kattenlaw.com |

| | |
|---|---|
| Edward W. Feldman<br>Diane Frances Klotnia<br>Michael L. Shakman<br>Thomas M. Staunton<br>MILLER SHAKMAN & BEEM LLP<br>180 North LaSalle Street<br>Suite 3600<br>Chicago, IL 60601<br>(312) 263-3700<br>(312) 263-3270 (fax)<br>efeldman@millershakman.com<br>dklotnia@millershakman.com<br>mlshak@aol.com<br>tstaunton@millershakman.com | David A. Hardesty<br>Thomas M. J. Hathaway<br>Paul F. Novak<br>CLARK HILL<br>500 Woodward Avenue<br>Suite 3500<br>Detroit, MI 48226-3435<br>313-965-8363<br>dhardesty@clarkhill.com<br>Pnovak@clarkhill.com<br>thathaway@clarkhill.com |
| Jonathan Lawrence Lewis<br>Andrew Stanley Marovitz<br>MAYER BROWN LLP<br>71 South Wacker Drive<br>Chicago, IL 60606<br>(312) 782-0600<br>courtnotification@mayerbrown.com<br>courtnotification@mayerbrownrowe.com | David B. Gunsberg<br>322 N. Old Woodward Avenue<br>Suite 200<br>Birmingham, MI 48009<br>248-646-9090<br>davidgunsberg@hotmail.com |
| Michelle R. Heikka<br>Kenneth J. McIntyre<br>L. Pahl Zinn<br>DICKINSON WRIGHT<br>500 Woodward Avenue<br>Suite 4000<br>Detroit, MI 48226-3425<br>313-223-3500<br>mheikka@dickinsonwright.com<br>kmcintyre@dicksinwright.com<br>pzinn@dickinsonwright.com | Sandra D. Hauser<br>Robert N. Potter<br>SONNENSCHEIN, NATH, &<br>ROSENTHAL LLP<br>1221 Avenue of the Americas<br>New York, NY 10020<br>212-768-6700<br>212-768-6800 (fax)<br>shauser@sonnenschein.com<br>rpotter@sonnenschein.com |
| Fred K. Herrmann<br>KERR, RUSSELL, AND WEBER PLC<br>500 Woodward Avenue<br>Suite 2500<br>Detroit, MI 48226-3406<br>313-961-0200<br>fkh@krwlaw.com | Howard B. Iwrey<br>DYKEMA GOSSETT<br>39577 Woodward Avenue<br>Suite 300<br>Bloomfield Hills, MI 48304-2820<br>248-203-0526<br>248-203-0763 (fax)<br>hiwrey@dykema.com |

| | |
|---|---|
| Sheldon H. Klein<br>Mark T. Nelson<br>Bruce L. Sendek<br>William B. Slowey<br>Michael R. Turco<br>BUTZEL LONG (DETROIT)<br>150 W. Jefferson<br>Suite 900<br>Detroit, MI 48226-4430<br>313-225-7000<br>klein@butzel.com<br>sendek@butzel.com<br>slowey@butzel.com<br>turco@butzel.com<br>nelson@butzel.com | Shari Ross Lahlou<br>Bethany M. Wimsatt<br>CROWELL & MORING<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC 20004-2595<br>202-624-2500<br>slahlou@crowell.com<br>bwimsatt@crowell.com |
| Jill L. Marr<br>HONIGMAN MILLER SCHWARTZ &<br>COHN LLP<br>660 Woodward Avenue<br>Suite 2290<br>Detroit, MI 48226-3506<br>313-465-7000<br>313-465-8000 (fax)<br>jmarr@honigman.com | Terrence J. Miglio<br>Jonathon A. Rabin<br>Mark S. Wilkinson<br>KELLER THOMA<br>440 E. Congress<br>5th Floor<br>Detroit, MI 48226-2918<br>313-965-7610<br>tjm@kellerthoma.com<br>jar@kellerthoma.com<br>msw@kellerthoma.com |
| James D. Wilson<br>HARRIS SHELTON DUNLAP COBB &<br>RYDER<br>One Commerce Square<br>Ste. 2700<br>Memphis, TN 38103<br>901-525-1455<br>jwilson@harrisshelton.com | Robert F. Leibenloft<br>Corey W. Roush<br>Mitchell E. Zamoff<br>HOGAN & HARTSON LLP<br>555 Thirteenth Street, NW<br>Washington, DC 20004<br>CWRoush@HHLAW.com<br>RFLeibenluft@HHLAW.com<br>MEZamoff@HHLAW.com |

/s/ Charles E. Tompkins

# EXHIBIT 1

Judge Grady Ruling 11-14-107

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   LISA REED, et al.,        )   No. 06 C 3337
                               )
 4              Plaintiffs,    )
                               )
 5        vs.                  )   Chicago, Illinois
                               )
 6   ADVOCATE HEALTH CARE, et al.,)
                               )   November 14, 2007
 7              Defendants.    )   2:00 p.m.

 8                   TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE JOHN F. GRADY
 9
     APPEARANCES:
10
     For the Plaintiffs:       MR. THOMAS P. DOVE
11                             (The Furth Firm, LLP,
                                225 Bush Street, 15th Floor,
12                              San Francisco, California  94104)

13                             MR. MARVIN A. MILLER
                               MR. MATTHEW E. VAN TINE
14                             (Miller Law LLC,
                                101 North Wacker Drive, Suite 2010,
15                              Chicago, Illinois  60606)

16                             MR. DAVID P. DEAN
                               (James & Hoffman,
17                              1101 Seventeenth Street, N.W.,
                                Suite 510, Washington, D.C.  20036)
18
                               MR. CHARLES E. TOMPKINS
19                             (Cohen, Milstein, Hausfeld & Toll,
                                1100 New York Avenue, Suite 500,
20                              West Tower, Washington, D.C.  20005)

21   For Defendant Advocate
     Health Care:              MR. MICHAEL I. SHAKMAN
22                             MR. EDWARD W. FELDMAN
                               (Miller, Shakman & Breem, LLP,
23                              180 North LaSalle Street, Suite 3600,
                                Chicago, Illinois  60601)
24

25            PATRICK J. MULLEN, Official Court Reporter
       219 South Dearborn Street, Room 2128, Chicago, Illinois  60604
```

Page 1

Judge Grady Ruling 11-14-107

1   APPEARANCES:   (Cont.)

2   For Defendant Children's
    Memorial Hospital:          MR. MARTIN T. TULLY
3                               (Katten, Muchin, Rosenman, LLP,
                                 525 West Monroe Street, Suite 1600,
4                                Chicago, Illinois  60661)

5   For Defendant Evanston
    Northwestern Healthcare:    MR. TIMOTHY F. HALEY
6                               MR. SCOTT A. SCHAEFERS
                                (Seyfarth Shaw, LLP,
7                                131 South Dearborn, Suite 2400,
                                 Chicago, Illinois  60603)
8
    For Defendant
9   Resurrection Health Care:   MR. DAVID MARX, JR.
                                (McDermott, Will & Emery, LLP,
10                               227 West Monroe, Suite 4400,
                                 Chicago, Illinois  60606)
11
    For Defendant University
12  of Chicago Hospitals:       MR. CHRISTOPHER Q. KING
                                MS. MARGO WEINSTEIN
13                              (Sonnenchein, Nath & Rosenthal,
                                 233 South Wacker Drive,
14                               7800 Sears Tower,
                                 Chicago, Illinois  60606)
15

16

17

18

19

20

21

22

23

24

25

                                                              3

1           THE CLERK:  06 C 3337, Reed versus Advocate
2   Healthcare.
                            Page 2

Judge Grady Ruling 11-14-107

3        THE COURT:  Good afternoon.  What we have this
4  afternoon is the defendants' motion to compel production of
5  documents improperly withheld by plaintiffs as attorney work
6  product.  I've read about all I can digest, and I have the
7  situation fairly well in mind.  I think I might be benefited by
8  like a five-or-ten-minute presentation from each side summing
9  up.

. . . .

4        THE COURT:  Thank you for these arguments, counsel.
5  This is not an easy question.  On the other hand, it's not one
6  that is brand new for us in this case.  It's been visited by
7  other judges, and the results have not been consistent.
8        Mr. Dean concluded with an observation that I think
9  is highly relevant to the problem we have here.  The paradigm
10  of the single practitioner who does a modest amount of
11  investigation before filing an action on behalf of a single
12  client still exists, but it has little relationship to the kind
13  of litigation we're involved with in this case.
14        The investigation that is required to verify the
15  possibility of a successful class action arising under
16  complicated statutory provisions is time-consuming, detailed,
17  and hugely expensive.  Very few lawyers and very few clients
18  have the funds necessary to pay for such an investigation.
19        The investigation will often include payment for
20  expert witnesses, for instance, in order to make sure that
21  there's even a viable legal theory that could be supported by
22  facts.  Witness interviews are wide-ranging geographically and
23  time-consuming in number and duration.
24        It is not surprising, therefore, as Mr. Dean points

Page 3

Judge Grady Ruling 11-14-107
25  out, that the genesis of most modern class actions lies in the

27

1  coiffeurs of organizations such as the SEIU in this case.
2  There are some law firms, of course, which have become so
3  enormously wealthy that the firms themselves can undertake the
4  investigation and pay for it out of the firm treasury, but
5  that's unusual.
6         So we have the phenomenon where there is an almost
7  necessary connection between investigation that is done by a
8  body which is not going to be a party to any litigation that
9  ensues from the investigation and the party who actually brings
10  the investigation.  There is no identity between the
11  investigating and subsidizing organization and the individual
12  plaintiff, or in the case of a class action even the individual
13  class members should a class ultimately be certified.
14         Does this mean that if the investigation done and
15  subsidized by the nonparty organization is in anticipation of
16  litigation and results in litigation that that investigation
17  has no work product protection?  Now, the defendants argue that
18  the answer to that question is yes, and that is because there
19  is a status known as nonparty which is occupied by SEIU.
20         Nonparty really in two senses, temporal in the sense
21  that at the time of the investigation there was no lawsuit and
22  there was no party.  So even if SEIU had wanted to be a party
23  conducting the investigation, there was nothing to be a party
24  to.  You can't put the cart before the horse.  You've got to
25  find out whether there is a prospect of successful litigation

28

Judge Grady Ruling 11-14-107

1  before the litigation is initiated.  That's what we call
2  investigation, and it's asked in anticipation of litigation.
3        Of course, aside from the temporal disconnection
4  between SEIU and the parties to this case, the parties
5  plaintiff to this case, there is the physical difference that
6  SEIU is not even now, you know, when there is a party and there
7  is a case on file, that SEIU is still not a party to that case.
8        So does this mean that the investigation sponsored by
9  SEIU is not protected?  The rule that is involved here, Rule
10 26(b)(3), talks about "materials prepared in anticipation of
11 litigation or for trial by or for another party" -- and that's,
12 of course, where the defendants' argument springs from,
13 "another party" -- "or by or for that other party's
14 representative" -- parentheses -- "including the other party's
15 attorney, consultants, surety, indemnitor, insurer, or agent."
16       Now, the parenthetical inclusions there make clear
17 that it doesn't have to be an attorney who does the
18 investigation.  An investigation done by an agent is
19 sufficient.  Can SEIU be regarded as the agent of the parties
20 who filed this lawsuit in the same sense that an investigator
21 who does investigation on behalf of a party plaintiff prior to
22 the filing of the suit is an agent of that party plaintiff?
23       The rule doesn't address that particular question and
24 was obviously not drafted with that question in mind.  The rule
25 and the Hickman case arose in situations that didn't

⬜                                                           29

Judge Grady Ruling 11-14-107

1  contemplate the problem that we're dealing with here today, and

2  they don't specifically address it.

3      I think it would be very unlikely for a sponsoring

4  organization, such as SEIU, who funds the large-scale

5  investigation that may or may not be a precursor to litigation

6  of this kind, would do that investigation without legal advice.

7  The fact that SEIU was being advised by James & Hoffman makes

8  complete sense.  The organization would need to know what to

9  look for, what questions to ask and, generally speaking, what

10  the significance of the answers might be.  So I find that the

11  representation that SEIU was acting in conjunction with

12  James & Hoffman in performing an investigation that was in

13  anticipation of litigation is a fact.

14      Now, does it make a difference in practical terms

15  that this lawyer-guided investigation on behalf of possible

16  litigants in anticipation of their possible litigation is

17  unprotected as work product?  Does it make sense to say that

18  just because the case hadn't been filed yet that there can be

19  no protection when the very purpose of the investigation is to

20  decide whether there should be a case on file?

21      It seems to me that we've got some cart-and-horse

22  problems here in the defendants' position.  If their position

23  were adopted, it seems to me it would encourage the filing of

24  lawsuits so that the necessary investigation which should

25  precede the filing would be protected as work product.  To do

30

1  the kind of investigation required by Rule 11 prior to filing

2  would rob one of work product protection, if I understand the

3  implications of the defendants' position.  That, it seems to

Page 6

Judge Grady Ruling 11-14-107

4  me, would not be a desirable result.

5        I think if the framers of Rule 26(b)(3) had

6  contemplated the specific problem we're addressing, they would

7  have written the rule in such a way that protection would be

8  afforded to attorney-guided investigation in anticipation of

9  litigation when the litigation that ultimately ensues was the

10 product of that investigation.

11       Now, there are some cases that the parties have cited

12 that are worth noting.  Well, I'll cite one, one case in

13 particular that I like the language of because it makes sense

14 to me.  At page 10 of the plaintiffs' memorandum, there is a

15 reference to the case of Goodyear Tire and Rubber Company

16 against Chiles, C-h-i-l-e-s, Power Supply, Inc., a Southern

17 District of Indiana case where court said:

18       "If third parties could not claim work product, the

19 prospect of freeloading by both direct and indirect routes

20 creates exactly the same risks and incentives that led the

21 Supreme Court to recognize the work product privilege in

22 Hickman."

23       It seems to me that what the defendants are asking

24 here does, indeed, smack of freeloading.  Now, what did Hickman

25 say would be permissible as opposed to freeloading?  I'm

31

1  setting to one side the question of nonparty here.  Hickman

2  said that the reports of the investigation, the witness

3  interviews, and the notes of the interviews could not be

4  obtained by the personal injury plaintiff in that case because

5  there was no showing that it was necessary to invade the work

Page 7

Judge Grady Ruling 11-14-107

6 product of the attorney.

7        In that case, as was pointed out today by Mr. Marx,

8 the work had been done by the attorney. Let me say at this

9 juncture so that I don't forget it that I don't think it makes

10 a bit of difference whether the interview was conducted by an

11 attorney or by an investigator acting at the direction or

12 request of an attorney. That's nothing new. That's been the

13 law for a long time. So I don't think Hickman is

14 distinguishable on the basis that it was the attorney who did

15 the interview.

16        What the court said at 329 U.S. at 512 was this:

17        "The general policy against invading the privacy of

18 an attorney's course of preparation is so well-recognized and

19 so essential to an orderly working of our system of legal

20 procedure that a burden rests upon the one -- on the one who

21 would invade that privacy to establish adequate reasons to

22 justify production through a subpoena or court order."

23        I am applying that rule to the problem before me. I

24 agree with the plaintiffs and case law to the effect that

25 Hickman goes somewhat beyond the 26 rule -- Rule 26(b)(3), and

                                                  32

1 whether there's a common law of work product or not, I won't

2 get into. That's not for me to say.

3        But the language of Hickman certainly indicates that

4 invading the work product of an attorney, which for the reasons

5 I've explained I regard the SEIU-sponsored investigations by

6 these various groups to be, requires exceptional circumstances.

7 Hickman itself gave some examples. The witness may be dead.

8 Conceivably, if the witness refused to talk to the other side,

Page 8

Judge Grady Ruling 11-14-107

9  that might well be a reason.

10          But the plaintiff -- or the defendants have made no

11  effort on the present motion to demonstrate any need for the

12  plaintiffs' work product.  If there were any need for it,

13  surely they would have told me what it was.  What they seek, of

14  course, is possibly impeaching statements to use against

15  plaintiffs' witnesses if it turns out that they had been

16  interviewed or, although in this day and age one wonders

17  whether this is ever a consideration, perhaps to avoid doing

18  the work themselves.  But those aren't a showing of need.

19  They're a showing at most of a convenience.

20          I find the dual purpose of the SEIU's investigation

21  to be immaterial.  First of all, it seems to me that the

22  primary and dominant purpose was to find out whether there was

23  a lawsuit worth filing.  Union organization was secondary.  Of

24  course, what I mean by "secondary" is that if a successful

25  lawsuit were filed at the instance of the union, that would

                                                              33

1  probably promote union membership.  It would be a necessary

2  consequence of successful litigation if the litigation turned

3  out to be productive.

4          But the primary purpose was to determine whether

5  litigation had a reasonable prospect of success.  In that

6  sense, it was an investigation conducted in contemplation of

7  litigation, albeit it may have had a secondary effect of

8  stimulating union membership should the litigation be

9  successful, or even perhaps should it be filed.  Maybe even the

10  mere filing of the case would generate union membership.  In

Judge Grady Ruling 11-14-107
11    any case, it's a secondary consideration.

12         I realize that the rule I'm announcing today may have

13    applications beyond what I foresee in announcing it, but I'm

14    not worried about that because I think if the ruling is

15    confined to the situations having the elements that I've taken

16    pains to emphasize there will be no problem, and those elements

17    are lawyer involvement in an investigation in anticipation of

18    litigation which results in litigation by or on behalf of the

19    persons whose interests were sought to be promoted in the

20    anticipated litigation.

21         If all of those elements are present, then I see no

22    problem with the fact that those persons who turn out to be the

23    parties in the litigation that results from the investigation

24    were not parties to the nonexistent litigation at the time the

25    necessary investigation in anticipation of the litigation was

⬜                                                            34



1    being conducted.

2         For those reasons, the motion of the defendants to

3    compel production of work product is denied.  Did the

4    plaintiffs have a corresponding motion for a protective order,

5    or is the denial of this motion sufficient to cover the

6    subject?

7         MR. DEAN:  It's sufficient, Your Honor.

8         THE COURT:  Are there any questions?

9         MS. WEINSTEIN:  Your Honor, if I may, Margo Weinstein

10    for the University of Chicago Hospitals.  Your comments raised

11    an issue that weren't in the briefs.  I don't think it will

12    change your ruling, but I think it's important.

13         THE COURT:  Go ahead.

Judge Grady Ruling 11-14-107

14        MS. WEINSTEIN:   It's that I believe the statement you
15   made that the SEIU could be a representative as that's used in
16   26(b)(3), I believe that would be a violation of federal labor
17   law as relates to the University of Chicago nurses.   They are
18   represented by the INA which is their sole representative, and
19   I think that's going to become very important throughout the
20   case.   But to say that the SEIU is the representative of nurses
21   that are in another union, I think that would be a violation of
22   federal labor law.
23        THE COURT:   I was using "representative" not in the
24   technical sense that you are.   A person can have 100
25   representatives for different purposes.   You can have a

                                                              35

1   representative for the purpose of going to the grocery store
2   for you, for the purpose of investigating a possible lawsuit,
3   and for the purpose of representing you in union collective
4   bargaining matters.
5        MS. WEINSTEIN:   The purpose of the --
6        THE COURT:   I understand what you're saying.   I think
7   it has no merit, and it doesn't worry me in the least.
8   Anything else?
9      (No response.)
10        THE COURT:   Okay.   Thank you.   I'll see you then on
11   what, January 23rd?
12        MR. MILLER:   January 23rd, Your Honor.
13        THE COURT:   All right.   Thank you.
14      (Proceedings concluded.)
15

Judge Grady Ruling 11-14-107

16                    C E R T I F I C A T E

17              I, Patrick J. Mullen, do hereby certify that the
         foregoing is a complete, true, and accurate transcript of the
18       proceedings had in the above-entitled case before the Honorable
         JOHN F. GRADY, one of the judges of said court in Chicago,
19       Illinois, on November 14, 2007.

20

21                                    _____
                                             Official Court Reporter
22                                       United States District Court
                                        Northern District of Illinois
23                                             Eastern Division

24

25

=

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LISA REED and CINDY DIGIANNANTONIO, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>ADVOCATE HEALTH CARE, CHILDREN'S MEMORIAL HOSPITAL, EVANSTON NORTHWESTERN HEALTHCARE, MICHAEL REESE MEDICAL CENTER CORPORATION, DOCTORS COMMUNITY HEALTHCARE CORPORATION, RESURRECTION HEALTH CARE, and UNIVERSITY OF CHICAGO HOSPITALS,<br><br>    Defendants. | Civil Action No. 06 C 3337<br><br>Judge John F. Grady |

## Declaration of David Palmer Dean

I, David Palmer Dean, declare as follows:

1.    I am a member of the law firm of James & Hoffman, P.C. ("J&H").  J&H has been designated as Co-Lead Plaintiffs' Counsel in the above-captioned litigation.

2.    I offer this Declaration to support Plaintiffs' assertion of work product protection for documents prepared as part of the pre-filing investigation and case preparation for this and related nurse wage litigations by J&H and Cohen, Milstein, Hausfeld and Toll ("CMHT").  This Declaration supplements certain facts set forth in the Revised Declaration of Mary Joyce Carlson ("Carlson Declaration") filed on July 13, 2007, in Fleishman v. Albany Medical Center, Civil Action No. 06-CV-765 (THM/DRH)

(E.D.N.Y.), appended as Ex. D to Plaintiffs' Sur-Reply in Opposition to Defendants'
Motion to Compel Production of Documents Alleged to be Improperly Withheld by
Plaintiffs as Work Product.

**Pre-Filing investigation for the Nurse Wage Cases by J&H and CMHT**

3.      In or about September 2004, J&H learned of evidence strongly suggesting that hospitals
        in the                          , area were engaging in an illegal conspiracy to avoid
        competition on RN wages.  On January 10, 2005, a prospective representative plaintiff
        for a putative class of registered nurses employed by            -area hospitals retained
        J&H to represent him in a wage collusion class action against those hospitals.  I attach a
        true and correct of copy of that retainer as Attachment 1 to this Declaration, redacted to
        protect the identity of this          area nurse.

4.      Beginning in or about January 2005, J&H undertook a litigation project under J&H's
        direction and control, but financed by and in collaboration with the Service Employees
        International Union ("SEIU"), to develop potential class action law suits by nurses in
        multiple regional markets challenging hospitals for colluding to suppress nurse wages.

5.      The Nurse Alliance of the SEIU supported the project in the form of financing, support
        as requested by J&H from health economists in the SEIU research department, and by
        forwarding material to J&H from some of the Nurse Alliance's own information
        collection and analytical efforts that it believed might be relevant to the J&H litigation
        project.  From its inception, the project contemplated that J&H would develop the cases

for the benefit of nurses in the regional markets and would represent these classes of nurses in ensuing litigation, including in that jurisdiction where J&H had already been retained.

6. In May 2005, SEIU financed the retention of an economic consulting firm, Ashenfelter & Ashmore ("A&A"), to perform econometric analyses identifying the nurse labor markets most strongly exhibiting the indices of employer collusion, a supporting project directed by Princeton economics professor Henry Farber.

7. Professor Farber's expert analysis was carried out under J&H's direction and control as part of the litigation project. At J&H's request, a health economist from SEIU's research department worked closely with J&H on this project, and SEIU research provided access to certain of its databases for Professor Farber's use. J&H shared the resulting ranking of nurse labor markets by Professor Farber with SEIU, which then used the rankings to inform its own public campaign efforts and allowed one of Professor Farber's underlying calculations to be used in a published report financed by SEIU. In light of SEIU's use and to avoid even the appearance that Plaintiffs are claiming work product protection for "dual purpose" documents, Plaintiffs in this action are not asserting work product protection for this aspect of counsel's pre-filing investigation. See Attachment 2.

8. In October 2005, J&H retained the Mintz Group, a private investigative firm, to conduct an investigation into possible collusion on nurse wages among hospitals in those metropolitan areas where J&H had determined, based on all available facts and analyses,

that collusion was most likely. A true and accurate copy of the retainer agreement with Mintz for this work is appended as Attachment 3.

9.   As reflected in the Mintz retainer agreement, J&H retained Mintz expressly "in anticipation of class action litigations on behalf of nurses in several labor markets against hospital employers, utilizing the results of the investigation," where J&H determined that sufficient evidence existed for filing suit. The retainer, which was finalized after the conclusion of negotiations over pay rates and other terms in February 2006, also provided that Mintz was retained "to assist J&H in providing legal advice to SEIU on possible collusion by hospital employers in violation of the antitrust laws." SEIU required such advice to determine whether and where the antitrust litigations were viable to support in its role as a third party payor, an arrangement later formalized, memorialized and continued for a portion of the litigation itself. I append as Attachment 4 to this Declaration a true and correct copy of the most recent version of the third party payor agreement between SEIU and J&H, which was produced to the Chicago Defendants on June 25, 2007.

10.   From December 9, 2005, forward, J&H split the costs of the Mintz investigation with CMHT, a law firm that to my knowledge has never represented the SEIU. CMHT's principal role pre-filing was to evaluate whether a sufficient basis existed for commencing litigation, to assist in directing the Mintz Group investigation and to assist in preparing the nurse wage cases for filing.

11.     In short, SEIU did not retain the Mintz Group, did not direct or control the Mintz

investigation, and never saw or used the fruits of its investigations. Only after the SEIU

was first subpoenaed in a related nurse wage case did J&H forward certain of the Mintz

documents to SEIU's outside counsel, Bredhoff & Kaiser, as explained in paragraph 16

of the Carlson Declaration.

12.     For two Chicago Mintz interviewees, Plaintiffs' counsel followed up and procured

signed Declarations. Plaintiffs have not claimed work product protection for such

signed Declarations by witnesses -- as opposed to the notes, drafts and interview

summaries in the Mintz files. See, e.g., Declarations from Christopher Thornton and

Brent Underwood, appended as Attachments 5 and 6.

## SEIU's Public Communications Campaign

13.     As recounted in paragraph 8 of the Carlson Declaration, the SEIU Nurse Alliance carried

on a public communications campaign on nurse wages as part of its normal business

activities, distinct from its support for the J&H litigation project described above. SEIU

forwarded at least some results of its own information collection and analytical efforts in

the public campaign to J&H for J&H's independent consideration in pursuing the

litigation project. Plaintiffs are not claiming a work product privilege for any of those

documents. For example, SEIU forwarded to J&H the study published by the Institute

for Women's Policy Research that is attached to the Carlson Declaration as Ex. 11.

SEIU also forwarded to J&H a Memorandum by SEIU researcher David DeRosa that

records the results of his research in Chicago, appended hereto as Attachment 7. SEIU

similarly forwarded the complete results of a national nurse survey it had commissioned (and for which J&H had been able to suggest several relevant questions). Plaintiffs have claimed work product over none of this material.

14. To the extent that J&H in turn forwarded select portions of any materials to the Mintz Group to inform their investigation, Plaintiffs are claiming work product protection only for those communications and selections, as they currently exist in the Mintz Group files, as distinct from the materials themselves in Plaintiffs files, SEIU's files or wherever else they may reside. For purposes of discovery in this case, Plaintiffs have treated the Mintz files on the nurse wage investigation as the equivalent of Plaintiff counsel's paralegal's files. So, for example, to the extent that Defendants made requests to which the Feldman polling survey was responsive, Plaintiffs' counsel have made that entire survey available from its files. Plaintiffs have not independently produced those excerpts from the survey, if any, that Plaintiffs' counsel had forwarded to Mintz because the entire Mintz file (like the working files of Plaintiff counsel's paralegals) is attorney work product.

15. Professor Barbara Bergmann consulted with SEIU on the Nurse Alliance public campaign pursuant to her formal retainer with SEIU. Pursuant to that retainer, for example, she developed a letter which was published in the New England Journal of Medicine in April 2006, appended as Attachment 8. Professor Bergmann also worked with J&H on the pre-filing investigation, during and after consulting with SEIU. Professor Bergmann's retainer with the SEIU provided that she might be called upon to do some work in support of the litigation under J&H's direction and control. See Ex. 7

to the Carlson Declaration at page 3. Professor Bergmann continued to work with J&H, however, after the expiration of her formal retainer with SEIU. By volunteering her services to J&H, she helped to prove her theories and she helped to develop the litigations which, in turn, may help to validate her theoretical work.

16.    Beginning in or about January 2006, SEIU began forwarding to J&H the names and phone numbers of nurses in various jurisdictions, eventually including Chicago, who were interested in finding out more about their legal rights in regard to possible collusion on nurse wages in their area. Plaintiffs are not claiming work product protection for documents generated by the SEIU in connection with its efforts in this regard.

17.    As counsel drafted complaints in these nurse wage cases in early 2006, counsel made specific inquiries to the SEIU research department concerning the interpretation of certain public data sources. Plaintiffs are currently claiming work product protection for only those communications between SEIU research and Plaintiffs' counsel that reveal the mental impressions of counsel in drafting the Complaints.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my recollection. Executed on 10/29 , 2007 at Washington, DC

David Palmer Dean

# ATTACHMENT 1

## AGREEMENT FOR ATTORNEYS' SERVICES REGARDING
## CLAIMS CONCERNING HOSPITAL ANTITRUST CONSPIRACY

1.  By this agreement, I authorize the law firm of James & Hoffman, P.C. and a
    law firm of its choice (the "Attorneys") to represent me in a lawsuit brought on behalf of
    me and other persons ("the plaintiffs") as nurses working in hospitals in the
                        area. The lawsuit may be a class action on behalf of all nurses working in and
    around                    . The lawsuit will assert that the defendants violated
    antitrust law by engaging in a conspiracy to suppress nurses' wages. My claims include,
    but are not necessarily limited to, a claim that the hospitals' actions caused me to receive
    less compensation for my work as a nurse than I would otherwise have received. Any of
    the plaintiffs, separately or as a group, may serve as my representative.

2.  I understand that the lawsuit may seek compensation, attorneys' fees, and costs (although
    it may seek other things, as well).

3.  In consideration for the Attorneys' services and in the event of a favorable judgment or
    settlement of this matter, I agree that the Attorneys may receive reasonable compensation
    for their services and reimbursement of any costs incurred. I agree that the Attorneys
    have the right to receive reimbursement of their professional compensation, plus incurred
    expenses and costs, paid by the defendants. If such recovery is not possible and if a lump
    sum settlement or no recovery is obtained, the Service Employees International Union
    ("SEIU") has agreed to pay attorneys' fees and costs. I will have no obligation to pay
    attorneys' fees.

4.  I acknowledge that the Attorneys represent multiple plaintiffs in this case. Although at
    present I and other plaintiffs share a common goal, it is possible for there to be conflicting
    or divergent interests as we go along. In the event of any conflict among the plaintiffs, I
    have agreed to abide by any decision recommended by the Attorneys regarding the course
    of this litigation, including whether or not it should be settled, to which a majority of the
    named plaintiffs who have retained the Attorneys subscribe. If I decide not to abide by a
    decision regarding the course of this litigation that has been recommended by the
    Attorneys and subscribed to by a majority of these plaintiffs, the Attorneys reserve the
    right to withdraw from further representation. In that event, the Attorneys agree to assist
    me in locating substitute counsel. Furthermore, I remain free at all times to retain my
    own counsel at my expense. Should I wish to do so, the Attorneys pledge to cooperate
    with my personal counsel.

**REDACTED**

**AGREED:**    DATE: 1/10/05        _____
                                    Signature

Page 1 of 2

<u>**PLEASE TYPE OR PRINT CLEARLY:**</u>

Name:     REDACTED

Home Address:    REDACTED

           City          State          Zip Code

Home Telephone Number:

Social Security Number:    REDACTED

Date of Birth:

**AGREED:**

Date:   1 / 10 / 05

          JAMES & HOFFMAN, P.C.
          1101 17th Street, N.W., Suite 510
          Washington, D.C.  20036

**ATTACHMENT 2**

Edgar N. James
Steven K. Hoffman
Judith A. Scott
Kathy L. Krieger
David P. Dean
Marie Chopra
Sean G. Rajkowski**
Katie B. Feiock
Courtney J. Chappell'

—————

Of Counsel:
Mary Joyce Carlson*
Martha Walfoort
Christy L. Hoffman

* not admitted in DC practice
limited to federal courts and agencies
* Not admitted in DC, supervised by
principals of firm

**JAMES & HOFFMAN**
A Professional Corporation
1101 17TH STREET, N.W., SUITE 510
WASHINGTON, D.C. 20036-4704

◀▬▬▶

(202) 496-0500
Facsimile: 202-496-0555
www.jamhoff.com

cjames@jamhoff.com
skhoffman@jamhoff.com
judy.scott@seiu.org
kltkrieger@jamhoff.com
dpdean@jamhoff.com
mchopra@jamhoff.com
sgbajkowski@jamhoff.com
kbfeiock@jamhoff.com
cjchappell@jamhoff.com

mjcarlson@jamhoff.com
mwalfoort@jamhoff.com
choffman@jamhoff.com

July 13, 2007

VIA ELECTRONIC SERVICE

The Honorable David R. Homer
United States Magistrate Judge
The United States District Court
Northern District of New York
James T. Foley – U.S. Courthouse
Albany, NY 122107-2924

Re:    _Fleischman v. Albany Medical Center, et al._, No. 06-CV-0765 (TMJ/DRH)

Dear Magistrate Judge Homer:

Attached please find a Revised Declaration from Plaintiffs' counsel Mary Joyce Carlson to substitute for the Declaration submitted by Plaintiffs on May 15, 2007, in opposition to Defendants' May 10 motion to compel the production of certain documents designated attorney work product. We do not believe the revision affects the issue before the Court.

The Revised Declaration corrects the final sentence of paragraph 11 of the original Declaration, which we recently learned misstated one fact: contrary to what Ms. Carlson or other Plaintiffs' counsel knew as of May 15, SEIU did use, in its public communications efforts, work done by economic experts retained by Plaintiffs' counsel to perform certain analyses in anticipation of this litigation. While reviewing documents from the Institute for Women's Policy Research (IWPR) last Friday evening, Plaintiffs' counsel became aware that IWPR apparently relied on an underlying calculation by the economic experts in a table at page 19 of the IWPR public communications report, citing an "unpublished [SEIU] analysis of 2003 data from the American Hospital Association's Annual Survey of Hospitals and the Center for Medicare and Medicaid Medicare Cost Reports and Historical Impact Files." (IWPR's report is Exhibit 11 to Ms. Carlson's Revised Declaration). SEIU, of course, used the IWPR study in its public communications efforts. In addition, SEIU apparently considered a ranking of cities by the economic experts in prioritizing cities for its own internal research in support of its public campaign on nurse wages and in support of this litigation.

The Honorable David R. Homer
July 13, 2007
Page 2

     Because the experts' work that SEIU referenced is being withheld from discovery
pursuant to a stipulation among the parties, rather than pursuant to any claim of attorney
work product, we do not believe that SEIU's use of the expert report is material to the
dispute between the parties over attorney work product.  Nevertheless, we wished to
immediately correct the misstatement in Ms. Carlson's Declaration -- and parallel
statements by Plaintiffs' counsel in oral argument -- that the experts' work was used
solely for the litigation.

                  Respectfully Submitted,

                  David P. Dean, Esq.

                  Counsel to Plaintiffs

Att.

**ATTACHMENT 3**

Edgar N. James
Steven K. Hoffman
Judith A. Scott
Kathy L. Krieger
David P. Dean
Marie Chopra
Amy B. Fettig
Sean G. Bajkowski*
Katie B. Feiock

Of Counsel:
Mary Joyce Carlson*
Martha Walfoort
Christy L. Hoffman

* Not Admitted in DC

# JAMES & HOFFMAN

A Professional Corporation
1101 17TH STREET, N.W., SUITE 510
WASHINGTON, D.C. 20036-4748



(202) 496-0500
Facsimile: 202-496-0555
www.jamhoff.com

cjames@jamhoff.com
skhoffman@jamhoff.com
scottj@seiu.org
klkrieger@jamhoff.com
dpdean@jamhoff.com
mchopra@jamhoff.com
abfettig@jamhoff.com
sgbajkowski@jamhoff.com
kbfeiock@jamhoff.com

mjcarlson@jamhoff.com
mwalfoort@jamhoff.com
choffman@jamhoff.com

February 9, 2006

VIA E-MAIL & FIRST CLASS MAIL

Andrew B. Melnick, Esq.
James Mintz Group, Inc.
32 Avenue of the Americas, 21st Floor
New York, NY 10013

Re:  Nurse Pay Matter

Dear Mr. Melnick:

This letter constitutes written confirmation of our firm's engagement of the James Mintz Group, Inc. ("JMG"), on the terms set forth below.  As you know, James & Hoffman, PC (J&H), acting on behalf of the Service Employees International Union (SEIU), retained JMG last October.  J&H retained JMG at that time to provide investigative services to assist J&H in rendering legal advice to the SEIU on possible collusion by hospital employers in violation of the antitrust laws, and also in anticipation of class action litigations on behalf of nurses in several labor markets against hospital employers, utilizing the results of the investigation.

J&H and JMG have agreed that JMG bills for services on an hourly basis.  JMG's investigators' normal hourly rates range from $120 to $375 per hour.  Most of the work in this matter has been, and will be, performed by investigators who usually work at rates between $200 and $275 per hour.  JMG has agreed to bill J&H at a 15% reduction from these normal JMG hourly rates.  JMG also bills J&H for any charges and disbursements such as computer databases, copies, fax, telephone, and overnight mail.  JMG has agreed to send bills on at least a monthly basis, and that the bills will include a breakdown of JMG's work, by service rendered and quarter hour.  J&H has agreed to arrange payment of JMG's bills within 30 days of receiving them.

JMG has agreed to undertake only such work as is authorized by J&H, and to work under J&H's direction and control.  JMG understands that various state laws and ethical standards govern investigations by attorneys within each state and JMG has specifically agreed to closely adhere to all directives by J&H to ensure compliance with such laws and standards and to achieve the parties' mutual intent of full compliance with applicable laws, rules, regulations and standards.  JMG warrants that it has or will procure any licenses, permits or other legal instruments required to perform its investigative services, and will comply with all laws, regulations or other legal rules applicable to such services.

Andrew B. Melnick
February 9, 2006
Page 2

JMG will report the information obtained in the course of its work only to J&H, or to such other firms, working as co-counsel with J&H, as J&H specifically directs. All documents, regardless of their source or nature, obtained or created by JMG in connection with this matter, shall be held by JMG solely for J&H's convenience and subject to J&H's absolute right to instruct JMG with respect to possession and control. This information will be provided to J&H for its exclusive use, and neither JMG nor J&H assumes liability in the event the other party misuses the information.

To the extent JMG is permitted under law to do so, JMG will promptly notify J&H of and follow J&H's direction with respect to any third-party effort, by subpoena or otherwise, to gain access to any document or information pertaining to this matter. J&H agrees to reimburse JMG for any reasonable fees or expenses JMG incurs as a result of or in the course of such response as J&H directs, including but not limited to JMG's fees for time spent by JMG employees, JMG's out of pocket expenses and the cost of legal representation for JMG, as approved by J&H.

All communications between JMG and J&H, between JMG and J&H's co-counsel in the nurse wage matter, as well as between JMG and any J&H's client in the nurse wage matter, shall be privileged and confidential and made solely for the purpose of assisting J&H in rendering legal advice to the client and in anticipation of litigation.

Please return an executed copy of this letter to me. We look forward to our continued working together on this matter.

Sincerely,

David P. Dean

BY: _____
Andy Melnick. Esq.
James Mintz Group, Inc.

2

**ATTACHMENT 4**



**SEIU.**®

**Stronger Together**

June 5, 2007

David P. Dean, Esq.
James & Hoffman, P.C.
1101 17th Street, NW, Suite 510
Washington, DC 20036

RE:    Nurse Wage Antitrust Litigation
       Special Project No. 280U-HSVRNLGL(R3)

Dear David:

This is to formally confirm the retainer and funding relationship between Services Employees International Union ("SEIU") the SEIU Legal Defense Fund ("the Fund") and your firm with respect to the matters referenced above. This letter replaces the retainer entered into by letter dated October 31, 2006.

SEIU retained your firm to follow up on certain research by the SEIU Nurse Alliance on possible hospital collusion in various United States markets to suppress nurse wages. Your firm commenced investigations that found evidence of such unlawful collusion in certain jurisdictions. SEIU has authorized you to share the results of those investigations conducted on SEIU's behalf with other law firms, and to use the results of such investigations to bring a series of class action antitrust suits to stop and remedy such collusion. We agreed that SEIU and Judith Scott would be walled off from any confidential information in such litigations, that your firm would represent the plaintiffs and the plaintiff class in such cases, and that, as a nonparty, SEIU would not make any demands on your firm concerning the litigations or otherwise interfere with your professional judgment about how best to serve the plaintiffs and the plaintiff class' interests. SEIU has referred interested nurses to you as potential plaintiffs in such actions and has entered the following agreements with respect to billing and expenses.

With respect to your billing for services rendered in such cases, you currently bill SEIU at a rate of $175 per attorney hour, representing a partial hourly fee. Paralegal hours are billed at a rate of $75 per hour. Your office breaks down all statements by matter and/or case, identity of attorney performing the service, hours expended, and a brief description of the work involved. With respect to any expenses, you submit copies of receipts of all expenses incurred. Expenses must be listed under the applicable case or matter, and a subtotal for each case or matter including fees and expenses must be provided. Please be advised that the SEIU will not reimburse separately for general overhead expenses, such as secretarial overtime, absent unusual and compelling circumstances. Bills should be addressed to the undersigned at the SEIU Legal Department and reference the case and SEIU Special Project No. 280U-HSVRN(R3). Consistent with our agreement that SEIU will not be privy to confidential information in such cases, we have agreed that your firm will refrain from revealing any confidential information in the billing entries, and that some entries may therefore be less detailed than is the firm's normal practice.

ANDREW L. STERN
International President

ANNA BURGER
International Secretary-Treasurer

MARY KAY HENRY
Executive Vice President

GERRY HUDSON
Executive Vice President

ELISEO MEDINA
Executive Vice President

TOM WOODRUFF
Executive Vice President

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

1800 Massachusetts Ave NW
Washington DC 20036

202 730 7000
TDD 202 730 7481
www.SEIU.org

David Dean, Esq.
June 5, 2007
Page Two

This litigation is being funded by the SEIU and the Fund through the payment of the partial hourly fee and costs incurred on the express understanding that any amounts SEIU or the Fund pays to your firm in this matter will be distributed to the Fund prior to any other payments to any other party or client, from any monetary recovery to your firm in the nurse wage litigation for which the fee or expense was advanced. In addition, to the extent permitted by any applicable laws and rules of professional conduct, the Fund shall be entitled to share in any fee recovery obtained above and beyond those amounts advanced by SEIU or the Fund in the litigation, pursuant to the sharing agreement provided below. Your firm will use its best efforts to ensure that any settlement obtained in this litigation will be consistent with the plaintiff nurses' interests in the case.

By signing this letter of understanding below, your firm agrees to the following: first, your office agrees that the Fund will be paid out of any recovery obtained for your firm (whether in a costs or fees award) for all monies advanced before any further distribution of fees and costs awards to your firm. Second, to the extent permitted by any applicable laws and rules of professional conduct, your firm agrees to share any fee recovery allocated to the hours worked by your firm[1] which is above and beyond the amounts advanced by SEIU or the Fund in the following manner. After payment to the Fund of the costs and fees advanced in connection with the litigation, if any additional amounts attributable to fees and costs remain, the amounts will be distributed as follows: 75% will be retained by your firm, with the remaining 25% returned to the Fund. Thank you for your assistance in this matter. We look forward to continue working with you.

Sincerely,

Norman M. Gleichman
Deputy General Counsel

So Agreed:

Date: 6/8/07

---

[1] This term contemplates that any division of fees between other attorneys and your firm will occur prior to the application of this provision of the agreement.

**ATTACHMENT 5**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LISA REED and MARY McDOWELL, on behalf of themselves and all others similarly situated, | ) Civil Action No. 06 C 3337 ) ) |
| Plaintiffs, | ) Grady, J. ) ) |
| vs. | ) ) |
| ADVOCATE HEALTH CARE, CHILDREN'S MEMORIAL HOSPITAL, EVANSTON NORTHWESTERN HEALTHCARE, MICHAEL REESE MEDICAL CENTER CORPORATION, DOCTORS COMMUNITY HEALTHCARE CORPORATION, RESURRECTION HEALTH CARE, and UNIVERSITY OF CHICAGO HOSPITALS, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## DECLARATION OF CHRISTOPHER THORNTON

I, Christopher Thornton, declare as follows,

1.      I am a former recruiter and human resources consultant at Advocate Trinity Hospital (hereinafter, "Advocate Trinity") in Chicago, Illinois, positions which I held approximately from 2002 to 2003. I am currently self-employed as a recruiter for Information Technology positions.

2.      During my tenure at Advocate Trinity I was informed by the director of human resources, Gretchen Vannetta, that she had received from Advocate's corporate headquarters the results of surveys conducted by Advocate headquarters employees of nurse salaries at other Chicago area hospitals. She gave me a copy of this survey, which listed most of the hospitals in the Chicago metropolitan area along with the entry level nurse wage currently being paid at that hospital. The survey also included information on the wages paid at each hospital for nurses as they progressed through years of experience.

3.      I was informed by Ms. Vannetta that the purpose of these surveys was to ensure that Advocate was paying nurse salaries which were comparable to those paid at other Chicago hospitals. The survey information was used to determine the nurse wage offered at Advocate Trinity.

4.    I was also informed by Ms. Vannetta that Advocate Trinity's entry-level wage for nurses, which in 2003 was roughly nineteen dollars per hour, was roughly within one dollar per hour of entry-level nurse wages at other Chicago hospitals. I recall that this information was confirmed by the survey that I was given.

5.    During my tenure Advocate Trinity employed two nurse recruiters, and did not engage recruiting agencies to assist the hospital in hiring nurses.

6.    During my tenure I and other Advocate Trinity recruiters tried to attract candidates based on training and certification opportunities. The hospital also did not offer sign-on bonuses to new hires.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my recollection. Executed on _October 5_, 2006 at _Chicago   Illinois_.

_Christopher Thornton_
Chistopher Thornton

**ATTACHMENT 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

LISA REED and MARY McDOWELL,           )    Civil Action No. 06 C 3337
on behalf of themselves and all others  )
similarly situated,                     )    Grady, J.
                                        )
        Plaintiffs,                     )
                                        )
    vs.                                 )
                                        )
ADVOCATE HEALTH CARE, CHILDREN'S        )
MEMORIAL HOSPITAL, EVANSTON             )
NORTHWESTERN HEALTHCARE, MICHAEL        )
REESE MEDICAL CENTER CORPORATION,       )
DOCTORS COMMUNITY HEALTHCARE            )
CORPORATION, RESURRECTION HEALTH        )
CARE, and UNIVERSITY OF CHICAGO         )
HOSPITALS,                              )
                                        )
        Defendants.                     )
_____)

### DECLARATION OF BRENT UNDERWOOD

I, Brent Underwood, declare as follows,

1.  I am a former human resources consultant at Advocate Trinity Hospital in
    Chicago, Illinois, a position that I held approximately from 2003 to 2005. I
    currently work for Keane, Inc. and operate out of my home in Gary, Indiana.

2.  As a human resources consultant at Advocate Trinity, I reported to and
    worked in the same office space as Advocate Trinity's vice-president of
    human resources, Gretchen Van Natta.

3.  Several times per week during my time at Advocate Trinity, I would overhear
    Ms. Van Natta exchange information on nurse wages in conversations on the
    telephone with her counterparts at other Chicago-area hospitals. These
    hospitals included Northwestern Memorial Hospital, Michael Reese Medical
    Center, Mercy Hospital and Medical Center, Rehabilitation Institute of
    Chicago and St. James Hospital, as well as other hospitals that I do not now
    recall.

4.  During my tenure at Advocate Trinity, Advocate Trinity hired Pamela Peavy-
    Lewis as its director of emergency services. Ms. Peavy-Lewis had previously
    worked at another health care facility in a suburb near Chicago. Ms. Lewis
    had developed close relationships with her counterparts at other Chicago area
    facilities. She contacted these counterparts to discuss nurse wages and
    provided the information on other facilities to Ms. Van Natta and other HR

employees. I know about these calls because Ms. Van Natta and Ms. Peavy-Lewis both told me about them.

5.  During this time, I had a personal friend who was employed as a hospital compensation analyst at Advocate Health Care's corporate headquarters in Oakbrook, Illinois. He told me that compensation analysts were instructed by corporate management to contact their counterparts at other Chicago area hospitals on a regular basis to exchange nurse compensation information in order to ensure that Advocate's nurse wages were comparable to those paid by other hospital systems.

6.  According to my friend, these calls by Advocate Headquarters staff took place several times a month and were considered a "job duty" by the compensation staff. During these exchanges, analysts would ask their counterparts for the "range of salary" for nurses in each department at the other facility. In turn, the compensation analysts would provide Advocate's compensation information to their counterparts. At one point, he showed me a chart with nurse salaries for Mercy Hospital, Northwestern Memorial Hospital and Jackson Park Hospital aligned against Advocate's nurse pay.

7.  During my tenure, Ms. Van Natta provided me with written copies of results of surveys comparing nurse pay scales at Advocate's facilities with those at other Chicago hospitals. I understood these reports to be produced using information gathered from several sources: (a) surveys of Chicago area nurse wages conducted by Advocate compensation analysts at headquarters calling area hospitals, (b) surveys by various third-party consultants and by the Metropolitan Chicago Healthcare Council (MCHC), and (c) the "off the record" conversations between local HR staff and their counterparts.

8.  My understanding at the time was that Advocate Health Care's senior executives used surveys of nurse wages conducted by its compensation analysts, third-party consultants and the MCHC, as well as information garnered through conversations between Advocate human resources employees and their counterparts at other hospitals, to ensure that Advocate's nurse wages stayed comparable to those at other Chicago area hospitals.

9.  While at Advocate Trinity, I personally attended a meeting of the major hospitals in the Chicago area where I heard senior hospital executives and human resources staff from Advocate Trinity and other Chicago area hospitals discuss nurse compensation issues and exchange nurse wage information.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my recollection. Executed on November 9, 2006 at Chicago, Illinois.

/s/

Brent Underwood

**ATTACHMENT 7**

Memo

To:      Barbara Bergman
From:   David DeRosa
Date:   10/26/05
Re:      Chicago MSA research

I spent a full week in Chicago, and contacted many hospitals either in person or via the phone. While some were as open as on my previous trips, I found it very hard to engage people without appointments—obviously Chicago is far more rife with professional distractions, and many of the bigger facilities had a long gauntlet to run in order to talk with anyone.

I also found more suspicion, and was outright interrogated a few times about where my interviews would appear and how the information would be used. Several facilities said they would only respond to inquiries directly from Dr. Bergman, specifically Rush and, to a lesser extent, Northwestern Memorial.

Finally, late in the week I heard my first objections to sharing of certain data. In a phone conversation to make an appointment at the University of Chicago MC, I was told they don't give out starting rates for RNs, even though as a unionized facility their contracts should be published. The next day, my last day in town, the representative of the Metropolitan Chicago Healthcare Council (MCHC) said that despite their quarterly RN wage surveys (as a "hot job"), they never communicate with their members via a listserv, supposedly because they didn't want to facilitate the HR departments talking with each other—it was the first time in this month of interviews that I heard someone point out the legal concern about collusion (or "price-fixing", as he called it). And in the in-person U of C. interview immediately after, I heard shock not only that other facilities had given me their RN starting rate, but that they would also share vacancy or turnover stats with me. U. of C made very clear they would talk about recruitment and retention only if I expressly did not ask about specific data points.

I could not say if these fears would have existed earlier in the week, or had developed during my stay. My impression at the time was that the U of C policy was constant, given the level of people I was talking to (and the fact that they are soon due to renegotiate the contract made it more fervent), but that at the MCHC, they may have gotten wind from their members as to the tenor of my questions and gotten worried.

I never did meet with the Illinois Hospital Association, as most of the HR people I interviewed made it clear that MCHC was far more important to their efforts in the market (as opposed to, say, their political interests downstate or nationally). Nor did I get outside of the Chicago boundary except for the two hospitals in Evanston—perhaps suburban failities would have been easier, but since I often couldn't even find out on the phone which campus or address I was to go to, the driving that would have entailed did not seem worth my time.

SEIU-CH 0103

Interviewees:

**Evelyn Schnitzer**, nurse recruiter, *Lincoln Park Hospital*

Lincoln Park hospital (formerly Grant Hospital) is a hospital in transition, and Ms. Schnitzer has been brought in to revive the ailing RN recruiting program. She was a great first interview, as she was talkative and very informed—it turned out she'd worked at seven or 8 or hospitals in Chicago, including some of the bigger ones, and was one of the founding members of the Healthcare Recruiters Association in 1976.

She freely talked about what she knew, and even showed me materials from MCHC and other trade groups, though only one sheet made available for photocopying (a nationwide survey). She said sign-on bonuses were widespread in Chicago, and had even gone up recently while they've dropped in many other cities. It was meaningless to talk about their new grad hire rate, since they hadn't hired any new grads in over a year and half (they were waiting to finish putting together a preceptor program), but she said the **rates had been "stable for a while," having not changed more than $.50 for "a couple of years."** She said most hospitals adjust their rates based on quarterly wage surveys put out by the MCHC—only twice a year for some jobs, but they fill in the other quarters for 'hot jobs', which always includes RNs.

As for HR people calling each other, she said that nurse references often include pay rates, so they often call to check those are correct. Beyond that, she said, **"There are people you can call to see if quoted rates** [those one hears through the grapevine], **differentials, and so on are right."** I asked who gets called, and she simply talk about she knew lots of people at various hospitals, and people had called her when she worked there. That led to her talking about the HCRA, which used to meet monthly in '76, but now (she said) meets mostly virtually. (Got no further details on those meetings.)

We also talked about how many nurses work in multiple hospitals (many, she said—most work either weekends or 3 12-hours shifts at one hospital, then per diem at others, so they know what the others pay. Schnitzer said that many hospitals (like hers) pay a premium of up to $5/hour for per diems that work over a set number of hours per pay period, which can make some nurses confused as to which rate they're working for.

I asked about cooperative work in the region, and she pointed to hospitals working together through the MCHC and IHA to **lower testing standards to make it easier for Puerto Rican RNs to come work in Illinois**, where they desperately need bilingual nurses. A law was just passed in the last leg session to do that (by eliminating a needed test.)

We also discussed the increasing use of magnet hospital status, and open houses rather than recruiting fairs—she said Resurrection spurns most recruiting fairs and focuses almost entirely on open houses at their facilities, something I could not confirm with that chain.

**SEIU-CH 0104**

**Barbara Del Moro**, Recruitment Coordinator, *St. Francis Hospital*

This was a very short (3 minute) conversation, but the only one I had in a Resurrection facility. She told me that Resurrection is doing a lot of recruiting in the Phillipines, that their starting rate for new grads ($23) was the "highest in the area"—I asked how she knew that, but got no clear response—and that their vacancy rate was under 1%. Del Moro personally had hired 300 nurses in the previous year, only about 15 of them new grads. All wages and compensation, she said, are set at the corporate level, and only they know how various hospitals compared, though feedback from hospitals was encouraged if certain rates were thought to be too low.

**Russell Dickow**, VP, Human resources, *Norwegian-American Hospital*

Nor-Am has no nurse recruiter right now—they're trying to hire one. Their stat rate was the lowest I heard ($21.63), but were having no turnover trouble, though he said their recruiting could be better. (They only have about 300 RNs, and half of them are per diem.) That new grad rate last went up in October 2004, and he said it tended to go up annually, "**more if the market goes crazy.**" They do use sign-on bonuses for needed positions, but rely more on referral bonuses and this family atmosphere to get and keep RNs. He said that if they need a closer comparison than they can get from wage surveys, they "**can call other facilities that they have good relationships with.**" Not all hospitals will take such calls—their closest competitor geographically is St. Mary's (a Resurrection facility), and they don't share rates.

**Cheryl Portner**, Nurse recruiter, *University of Chicago Hospital*

This was the one facility that made it clear that they don't answer calls from other facilities for rates—"**that would be illegal**" I was told over the phone before I even came in. They also wouldn't tell me anything about vacancy or turnover rates, or even how many RNs they had hired in the last year. It was clear they wouldn't share specifics.

Ms. Portner did tell me a bit about how recruiting works in a very prestigious, well-paying, heavily-unionized teaching hospital. Their career ladder, available to anyone after 4 months of work, takes LPNs to RNs, ADNs to BSNs, help some become combination MSN/MBAs, and pay 75% of what it takes to become a PhD—all supposedly without any requirement to stay at the hospital. To go from CNAs to LPN or RN, that ladder isn't used, but they use "transformation scholarships" instead.

**Referral bonuses go up to $2500**, and any in-house registry is unit specific. Benefits are "great", including things like concierge service and (my favorite) pet insurance. Oh yeah, free parking for the night shift was big. They're ¾ of the way to magnet status. I did ask how they did a market analysis of pay rates as they prepared for bargaining, but wasn't given any details. When I asked for a comment on the perception among other hospitals that they were the highest-paying facility in the region, Ms. Portner shrugged and said "Nurses are being appreciated more every year, and we think that's a good thing."

SEIU-CH 0105

**Gary Drain,** HR Services Director, *Metropolitan Chicago Healthcare Council*

My most interesting interview, even though he seemed quite guarded at first. MCHC collects unemployment, turnover, vacancy, and time-to-fill position data from nearly 100 hospitals—pretty much every one in Chicago except Michael Reese, now in bankruptcy. **They will soon be doing a "cost-per-hire" data field as well, which would include any sign-on bonuses.** Data is collected on 129 positions, with min/avg/max points.

MCHC, he bragged has existed since 1935 to represent the employers, and keep the unions out—market-wide, not in individual facilities. He suggested that the data collection work helps make that possible.

On any given day, Chicago has a 2500 RN shortage. They're doing work on many aspects, including the bottleneck at schools (by attempting to lower criteria for RN instructors.)

Their data, Mr. Drain informed me, does go out quarterly for RNs and other key jobs, but there is a 90-day lag so it's not too current. It's also blinded by facility, though the full data set can be cut by bed-size, #FTEs, or region—but those can't be combined to isolate facilities. However, in a way around that, **hospitals who want to can pay for a custom cut, which will average the most recent average wage (etc.) data for any 5 hospitals** —so they can compare themselves to their closest competitors if needed.

I asked about how that data is collected—online—and then asked if it was reported electronically. Yes, he said, but not as Excel tables, only as PDFs, to discourage further analysis.

I then asked if hospitals call each other to spot-check on rates. **"That used to be quite prevalent",** he said, **"but now concerns about the FTC and 'price-fixing' issues made it less common. Also, he said significantly, MCHC never sends out data or other information to a named listserv, since it facilitates that kind of communication.**

One other thing he said their data had shown that they hadn't seen nationally or in other markets—hospitals often pay retention bonuses only to RNs up to 3 years, but at least in Chicagoland, they had found that the RNs in the 3-5 year range were the ones most easily tempted away, so they will be telling their members to improve those bonuses to keep that workforce stable.

Last item—he said the state law banning mandatory overtime in Illinois didn't affect their members, since (according to him) none of them member hospitals used MOT in recent years.

**Suzanne Klinetop,** HR director, *Rush Memorial Hospital*

Would only talk to Dr. Bergman. Said their starting grad rate was $22.50 to $23.00.

SEIU-CH 0106

inner_view [https://v5 lextranet com/lcs/customDB-omni/inner_view lcs?session_key=71128_119359591 0_1000915objectID=3013155uniqueID=0fileID= Page 5 of 5

**Cathy Hickey**, HR representative, *Thorek Hospital* (over phone)

Said new grads get "up to $24/hour", they hired 4 or 5 last year. Thorek is a small for-profit hospital on the north side, a little on the shabby side, so it didn't surprise me their quoted starting rate was the highest I heard. **Rates "change with the market"**, mostly annually, and are set by her boss. When I asked how she changes them, Ms Hickey said **"My boss has good relationships with some other facilities. They're not generous with information, but they have a 'this-for-that' arrangement."** If that doesn't work, they do cold calls to other facilities. As far as she knew, there "wasn't widespread networking on wages—even benefit info could be hard to get."

**Minnie Enza**, HR person, *Evanston Northwestern Hospital* (over phone)

This hospital, on north side of Evanston, was quite busy, and I only got a brief phone interview. Their new grad rate is $22.75 (so, lower than St. Francis, the only other hospital in Evanston). They re-evaluate annually, with a "compensation team" that sets up a "hiring grid" with min/mid/max points, though they could make exceptions for positions they really needed to hire. All compensation problems go through them, so she didn't know how they compared themselves to other facilities.

Hospitals where I tried to get interviews and failed:

Swedish-Covenant
Northwestern Memorial
Mercy
Loyola
Alexian Brothers
Northwest Community

**SEIU-CH 0107**

**ATTACHMENT 8**



HOME | SUBSCRIBE | CURRENT ISSUE | PAST ISSUES | COLLECTIONS | HELP

| Keyword, citation, or author |    Advanced Search

Please sign in for full text and personal services

## CORRESPONDENCE

◄ Previous        Volume 354:1648-1649    **April 13, 2006**    Number 15        Next ►

# Curing the Nursing Shortage — The Role of Compensation

*To the Editor:* Like many others who discuss remedies for the shortage of nurses, Chaguturu and Vallabhaneni (Oct. 27 issue)[1] mention the issue of pay only in passing and emphasize such nebulous measures as the "creation of work environments that are challenging yet rewarding." Yet unrewarding working conditions cannot be the heart of the problem. Chronic shortages do not arise in other occupations with difficult working conditions, because the pay stays high enough to induce a sufficient supply of workers to endure them. We need to pay more attention to hospital practices that keep nurses' wages from rising enough to prevent the shortage from continuing.

The market for nurses is split into metropolitan areas, each dominated by a relatively small number of large employers, which facilitates anticompetitive behavior. We know that some hospitals have engaged in agreements to refrain from offering higher wages to attract nurses working for other hospitals in their area.[2] In 1996, the Department of Justice and the Federal Trade Commission, which are aware of this problem, issued guidelines for hospitals that defined anticompetitive behavior,[3] but stronger measures are needed. One measure could be the filing of a rash of antitrust suits by groups of nurses. At this writing, such suits are in preparation in a number of metropolitan areas. Another measure could be a drive for minimum nurse-to-patient ratios nationwide. If such measures increased pay and as a result attracted more new nurses and reduced departures, then working conditions, which are affected by staffing shortages at hospitals, would improve. Nursing schools, which have contracted, would expand. A 10 percent increase in nurses' pay and a 10 percent increase in the number of nurses employed would add about 1 percent to the nation's overall cost of health care.[4]

Barbara R. Bergmann, Ph.D.

**THIS ARTICLE**

► PDF
► PDA Full Text

**TOOLS & SERVICES**

► Add to Personal Archive
► Add to Citation Manager
► Notify a Friend
► E-mail When Cited
► E-mail When Letters Appear

**MORE INFORMATION**

► Related Article
  by Chaguturu, S.
► PubMed Citation

*American University*
*Washington, DC 20016*
*bberg@american.edu*

## References

1. Chaguturu S, Vallabhaneni S. Aiding and abetting -- nursing crises at home and abroad. N Engl J Med 2005;353:1761-1763. [Free Full Text]
2. United States v. Utah Society for Healthcare Human Resources Administration, No. 94 CV 282, (D. Utah C.D.) complaint for equitable relief for violations of 15 U.S.C. § 1, Sherman Antitrust Act, filed March 14, 1994.
3. Statements of antitrust enforcement policy in health care. Washington, D.C.: Department of Justice, Federal Trade Commission, August 1996:49-50.
4. Median weekly earnings of full-time wage and salary workers by detailed occupation and sex. Washington, D.C.: Department of Labor, 2005. (Accessed March 23, 2006, at http://www.bls.gov/cps/cpsaat39.pdf.)

---

*Dr. Chaguturu and Ms. Vallabhaneni reply:* Dr. Bergmann correctly notes that low salaries, which have not increased substantially since 1991 (after an adjustment for inflation), probably play a role in the declining supply of domestic nurses.[1] However, increasing wages alone is unlikely to resolve the domestic nursing shortage and will probably exacerbate the global nursing shortage. Inadequate staffing, heavy workloads, a lack of respect and recognition, and a perceived lack of authority are frequently cited as key areas of job dissatisfaction among nurses.

A General Accounting Office report cites several studies that explored this issue.[2] Of nurses who had considered leaving the patient care field, 18 percent wanted more money, whereas 56 percent were concerned about the stress and physical demands of the job. Another study showed that 39 percent of nurses were dissatisfied with their compensation, but 48 percent were dissatisfied with the level of recognition they received from their employer. In another survey, 57 percent of nurses were satisfied with their salaries, but only 33 percent felt that their facilities were adequately staffed, and only 29 percent felt that the hospital administration responded to their concerns.[3]

The approach to addressing the nursing shortage should be multifaceted; increasing wages alone may in fact exacerbate the "pull" factor for nurses from the developing world.

Sreekanth Chaguturu, M.D.
*Massachusetts General Hospital*
*Boston, MA 02114*


Snigdha Vallabhaneni, B.A.
*Brown Medical School*
*Providence, RI 02912*

## References

1. National Center For Health Workforce Analysis. Projected supply, demand, and shortages of registered nurses: 2000-2020. Washington, D.C.: Health Resources and Services Administration, July 2002. (Accessed March 23, 2006, at http://bhpr.hrsa.gov/healthworkforce/reports/rnproject/report.htm#chart7.)
2. Nursing workforce: multiple factors create nurse recruitment and retention problems. Washington, D.C.: General Accounting Office, 2001. (Accessed March 23, 2006, at http://www.gao.gov/new.items/d01912t.pdf.)
3. The Lewin Group. The hospital workforce shortage: immediate and future. Vol. 3. No. 2. TrendWatch. June 2001. (Washington, D.C.: American Hospital Association.)

**THIS ARTICLE**

▸ PDF
▸ PDA Full Text

**TOOLS & SERVICES**

▸ Add to Personal Archive
▸ Add to Citation Manager
▸ Notify a Friend
▸ E-mail When Cited
▸ E-mail When Letters Appear

**MORE INFORMATION**

▸ Related Article
  by Chaguturu, S.
▸ PubMed Citation

Comments and questions? Please contact us.

The New England Journal of Medicine is owned, published, and copyrighted © 2007 Massachusetts Medical Society. All rights reserved.

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# NORTHEN DISTRICT OF ILLINOIS

LISA REED, et al.,

                              Plaintiffs,              Civil Action No.
                                                       06-CV-3337

          vs.

ADVOCATE HEALTH CARE, et al.,

                              Defendants.

## DECLARATION OF MATTHEW CLASH-DREXLER

I, Matthew Clash-Drexler, state under penalty of perjury, that the following is true
and correct:

1.    I am an attorney at the law firm of Bredhoff & Kaiser, P.L.L.C.
("Bredhoff").

2.    Since November of 2006, I, along with other attorneys at Bredhoff have
served as counsel to the Service Employees International Union ("SEIU") for the purpose
of responding to the subpoenas served on the SEIU in this lawsuit, as well as in other
nurse wage antitrust lawsuits that were filed in Detroit, San Antonio, Albany, and
Memphis.  As such, I am familiar with the facts stated herein.

3.    As part of SEIU's effort to respond to the third-party subpoena served on it by
Defendant Advocate Health Care, Bredhoff attorneys received documents from attorneys at
James & Hoffman, P.C. ("J&H").

4.    Included in the documents that Bredhoff received from J&H were materials that
related to work that The Mintz Group ("Mintz") performed at the request of attorneys from J&H
(hereinafter the "Mintz documents").

5.    Bredhoff attorneys agreed with J&H that Bredhoff would not share the Mintz documents or any information contained in those documents with SEIU personnel.

6.    Bredhoff attorneys have not shared with any personnel at SEIU any of the Mintz documents or any information contained in those documents.

_____
**Matthew Clash-Drexler**

Dated: 10/23/07

2